[No. 33848-3-II.   Division Two.   December 12, 2006.]

DIANNA LYNN, *Individually and as Personal Representative and Guardian ad Litem, Appellant,* v. LABOR READY, INC., *Respondent.*

---

[48] *State ex rel. Pub. Disclosure Comm'n v. Wash. Educ. Ass'n,* 117 Wn. App. 625, 641, 71 P.3d 244 (2003).

296

*Thaddeus P. Martin IV*, for appellant.

*Kelly P. Corr* and *Kelsey L. Joyce* (of *Corr Cronin Michelson Baumgardner & Preece, LLP*), for respondent.

¶1 HUNT, J. — Dianna Lynn represents the estate of Dori Cordova and Cordova's minor son, Troy Phillips, for whom she is guardian ad litem. Lynn appeals the trial court's summary judgment dismissal of her action against Labor Ready, Inc., for negligence, negligence in hiring, and Cordova's wrongful death.[1] She argues that the trial court erred in finding no proximate-cause nexus between Labor Ready's breach of duty, in placing Lawrence Owens as a temporary janitor at the Young Women's Christian Association (YWCA) Opportunity Place, and Owens' murder of Cordova at her off-site residence.

¶2 Labor Ready cross-appeals, arguing that the trial court erred by (1) allowing Lynn to elicit inadmissible hearsay, (2) ruling that Labor Ready owed a duty to Cordova, and (3) imposing insufficient sanctions against Lynn for discovery violations. Labor Ready also asks us to impose sanctions against Lynn on appeal.

¶3 Holding that Lynn did not show a causal link between Labor Ready's alleged breach of duty and Cordova's murder, we affirm. We also impose sanctions against Lynn's counsel on appeal.

## FACTS

### I. OWENS' CRIMINAL HISTORY

¶4 On September 24, 2003, the State released Lawrence Owens from prison on condition that Community Corrections Officer (CCO) Eileen Fermanis supervise him on

---

[1] Lynn does not, however, appeal the trial court's dismissal of her related breach-of-contract claim.

community custody for 12 months. After his release, Owens regularly contacted CCO Fermanis, and he was in good standing with his community custody supervision.

¶5 The State designated Owens a level III sex offender, the highest risk of recidivism. His past showed a pattern of violence against women, which included forcing sexual intercourse upon a woman, grossly assaulting women, unlawfully imprisoning his ex-girlfriend, kidnapping another ex-girlfriend, and making death threats with guns. He had previous convictions for second degree assault, unlawful imprisonment, unlawful possession of a firearm, second degree assault with sexual motivation, and second degree kidnapping.

## II. Owens' Relationship with Victim

### A. Residential Neighbors

¶6 On the day he was released from prison, Owens moved into apartment 311A of the Jensonia Hotel.[2] Dori Cordova lived in apartment 302A of the Jensonia, on the same floor 20 feet down the hall from Owens' apartment. According to the attendant at the Jensonia's front desk, Owens and Cordova met while living near each other at the Jensonia and became involved in friendship that escalated into a romantic relationship.[3]

¶7 In March 2004, the Jensonia burned, displacing Owens and Cordova. They moved into a Red Cross emergency shelter at the Miller Community Center, where they chose to sleep on adjacent cots. The Miller Community Center is approximately two miles from the YWCA Opportunity Place. The two facilities are not affiliated.

---

[2] The Jensonia, formerly a run-down hotel, now functions as low-cost apartments.

[3] The Jensonia clerk's testimony was uncontroverted, in spite of (1) Lynn's attempt to offer hearsay evidence from Cordova's friends, implying that Cordova first met Owens at the YWCA in January, he offered to help her apply for YWCA housing, and they were unaware of a romantic relationship with him and (2) the trial court's ruling that there remained an issue of fact about where Owens and Cordova met.

## B. Owens' Labor Ready Employment

¶8 On December 10, 2003, Owens applied for a job at Labor Ready, a temporary employment agency. That same day, Labor Ready placed Owens at MacMillan-Piper, Inc. As was their policy, Labor Ready did not investigate Owens' criminal history.

¶9 According to CCO Fermanis, (1) the Department of Corrections has high concern for placing level III sex offenders in public work environments; (2) she was "adamantly opposed" to placing Owens where he would be in contact with women from a shelter, she much preferred placing him in a warehouse-type working environment, and, if Labor Ready had contacted her, she "would have been adamantly opposed to" placing Owens in a shelter situation such as Opportunity Place; (3) she contacted Labor Ready several times, including Seattle branch manager Shauna Rossio, shortly after Owens began working for Labor Ready, informed Labor Ready about Owens' level III sex offender status, and spoke with Rossio about the appropriateness of placing Owens to work in a warehouse.

¶10 Rossio denied ever hearing from Fermanis or otherwise learning that Owens was a level III sex offender.[4] Labor Ready did not contact CCO Fermanis to discuss the appropriateness of placing Owens at a YWCA facility. And YWCA policy did not require criminal background checks for its temporary workers.

¶11 On January 2, 2004, Labor Ready placed Owens at the YWCA housing project, Opportunity Place,[5] to perform custodial tasks in unfinished sheetrock areas strewn with construction materials on the main and second floors where, supposedly, no one lived. According to Rossio, she

---

[4] These facts remain disputed. They are not, however, material to whether summary judgment was appropriate.

[5] According to the program purpose and tenant eligibility statement, "YWCA Opportunity Place Apartments offers safe, affordable housing to help low-income and formerly homeless persons maintain their stability and self-sufficiency efforts." Clerk's Papers at 649.

was not aware that Opportunity Place was intended to be a "safe haven" for women and children. After placing Owens, Rossio completed a site inspection of Opportunity Place.

¶12 In January 2004, Rossio learned that Opportunity Place was currently housing women and children. From that point on, she believed that Owens would be working on a vacant floor of the building and that he would not have access to other "secured" floors where women and children were housed.[6] Owens continued to work at the YWCA Opportunity Place through at least March 12, 2004, his last recorded day of work.[7]

¶13 Cordova had not enrolled in a YWCA program since 2001. Although Lynn offered inadmissible hearsay that Owens offered to help Cordova apply for YWCA housing through his "connections" there, and that she was seen "near" the YWCA in January 2004, the record contains no admissible evidence that Owens and Cordova met or were ever in contact at Owens' workplace at the YWCA.

## C. Owens' Murder of Cordova

¶14 After Cordova refused Owens' request to move with him to another location and after the possible breakup of their relationship, Owens shot and killed her at the Miller Community Center on March 17. In the aftermath, police shot and killed Owens.

### III. PROCEDURAL HISTORY

¶15 Dianna Lynn sued Labor Ready in her capacity as personal representative for Cordova's estate and as guardian ad litem for Cordova's minor son, Troy Phillips. Lynn claimed that Labor Ready was (1) negligent in hiring, placing, and supervising its employees, including Owens;

---

[6] Rossio admitted, however, that no one from the YWCA had told her that the building where Owens was sent to work would be continuously vacant.

[7] Because work tickets are recorded weekly, Owens could have been working for Labor Ready at the YWCA through March 17.

(2) negligent in causing Cordova's death, including that Labor Ready was responsible for Owens' actions under the respondeat superior principle; and (3) breached its contract with the YWCA, of which Cordova was a third-party beneficiary.

## A. Discovery

¶16 On March 17, 2005, Labor Ready served written discovery requests on Lynn, asking her to identify the five individuals closest to Cordova and to produce every document containing a fact supporting Lynn's claims. In her response and through May 2005, Lynn identified only two individuals close to Cordova. By July 2005, Lynn had listed about 40 potentially relevant witnesses.

¶17 Labor Ready moved for summary judgment on August 12. On August 29, Lynn filed her response, which included 18 witness declarations she had not previously furnished to Labor Ready. Some of the declarants were from Lynn's previous list of 40 witnesses, and some were new. Eleven new witnesses had signed their declarations before Labor Ready moved for summary judgment. Among the 11 new declarants were Cordova's sister, Cordova's "best friend," and a friend with whom Cordova's son, Troy Phillips, had lived immediately following his mother's death. But Lynn did not amend or add these three new witnesses to her previous response to Labor Ready's interrogatory asking her to identify the five individuals closest to Cordova, even though she had previously identified only herself and Troy Phillips.

¶18 Arguing that Lynn's proffered declarations were inadmissible hearsay, Labor Ready moved to strike them. Without specifying which portions were inadmissible hearsay, the trial court ruled:

> IT IS HEREBY ordered that Labor Ready's motion to strike is GRANTED as to the testimony which is inadmissible hearsay and DENIED as to the testimony which is admissible as set forth in plaintiff's [Lynn's] briefing.

IT IS FURTHER ordered that all references to inadmissible testimony in plaintiff's response to Labor Ready's motion for summary judgment are hereby STRICKEN, but that admissible testimony remains. After the inadmissible testimony is stricken, there remain material issues of disputed fact, so the matter is heard on further summary judgment regarding legal duty and legal proximate cause, using plaintiff's version of the facts to be proven at trial, e.g., that the parties did not meet until January 2004 at the YWCA facility.

Clerk's Papers (CP) at 1409.

## B. Summary Judgment

¶19 The trial court granted Labor Ready's motion for summary judgment and dismissed all of Lynn's claims. The trial court ruled that (1) there remained an issue of fact about where Owens and Cordova met; (2) although Labor Ready had breached its duty to Cordova, (3) there was no proximate cause connection between Labor Ready's negligence in placing Owens at Opportunity Place and Owens' murder of Cordova (4) because the remote, fortuitous, and incidental nature of the alleged contacts between Cordova and Owens at the YWCA was too tenuous to establish legal causation.

## C. Discovery Sanctions

¶20 Labor Ready moved for costs and fees, arguing that (1) Lynn's lawsuit was frivolous and not warranted by existing law, (2) Lynn had violated discovery rules, and (3) Lynn had misrepresented facts in her briefing to the trial court. Lynn admitted that some of the quotes attributed to witness Gerald Ketchum were "wrong" and the result of "sloppy legal work," but she argued that these errors were unintentional.

¶21 The trial court declined to sanction Lynn on the merits of the case or for her misrepresentations, which it found were unintentional. But the trial court did sanction

Lynn $1,000 for failure to comply strictly with the discovery rules on 10 occasions. Lynn promptly paid the sanctions.

¶22 Lynn appeals the summary judgment dismissal of her action. Labor Ready cross-appeals the trial court's rulings on the admissibility of evidence, its consideration of inadmissible hearsay to create an issue of fact about where Owens and Cordova met, the existence of a duty owed by Labor Ready, and the amount of the sanctions against Lynn.

## ANALYSIS

### I. SUMMARY JUDGMENT[8]

#### A. Standard of Review

¶23 When reviewing a summary judgment, we engage in the same inquiry as the trial court. *Coppernoll v. Reed*, 155 Wn.2d 290, 296, 119 P.3d 318 (2005). We consider all facts and reasonable inferences in the light most favorable to the nonmoving party. We consider questions of law de novo. *Coppernoll*, 155 Wn.2d at 296. We may affirm the trial court's ruling "on any basis supported by the record." *Coppernoll*, 155 Wn.2d at 296 (citing *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989)).

¶24 Summary judgment "shall be rendered forthwith if . . . there is no genuine issue as to any material fact" and the moving party shows that he is "entitled to a

---

[8] Lynn argues that the trial court erred in holding that Labor Ready's breach of duty to Cordova, in placing Lawrence Owens as a temporary janitor at the YWCA, did not proximately cause Cordova's murder. Labor Ready argues on cross-appeal that Lynn's negligence claim fails because (1) Labor Ready did not owe a duty to Lynn with respect to its employee, Lawrence Owens; (2) Labor Ready's alleged breach was not a legal cause of Cordova's death; and (3) Lynn cannot prove that, "but for" Labor Ready's placing Owens at the YWCA, Owens would not have murdered Cordova.

Because we find the lack of proximate cause dispositive, we do not address (1) the other arguments, such as the existence and breach of a duty, relating to the trial court's summary judgment dismissal of Lynn's negligence claim or (2) the trial court's finding of a material issue of fact as to whether Owens and Cordova first met at the YWCA in January 2004.

judgment as a matter of law." CR 56(c). A "material fact" is one upon which the outcome of the case depends. *Jacobsen v. State*, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977), *overruled on other grounds by Peeples v. Port of Bellingham*, 93 Wn.2d 766, 771, 613 P.2d 1128 (1980). The nonmoving party cannot rely on speculation to show material factual issues; instead, the nonmoving party must "set forth specific facts that sufficiently . . . disclose that a genuine issue as to a material fact exists." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

■■ ¶25 Moreover, like the trial court, in deciding whether summary judgment was proper, we consider only admissible evidence. *See Dunlap v. Wayne*, 105 Wn.2d 529, 535-36, 716 P.2d 842 (1986). We review de novo whether a statement was inadmissible hearsay. *State v. Edwards*, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is inadmissible unless it fits within an exception. ER 802.

## B. Proximate Cause

■■ ¶26 "The elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to plaintiff proximately caused by the breach." *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). "Proximate cause" is grounded in policy determinations about how far the consequences of a defendant's acts should extend. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478-79, 951 P.2d 749 (1998). "Proximate cause" is distinct from duty. *See Hertog*, 138 Wn.2d at 275.

> An employer may be liable for harm caused by an incompetent or unfit employee if (1) the employer knew, or in the exercise of ordinary care, should have known of the employee's

unfitness before the occurrence; *and (2) retaining the employee was a proximate cause of the plaintiff's injuries.*[9]

*Betty Y. v. Al-Hellou*, 98 Wn. App. 146, 148-49, 988 P.2d 1031 (1999) (emphasis added) (citing *Carlsen v. Wackenhut Corp.*, 73 Wn. App. 247, 252, 868 P.2d 882, *review denied*, 124 Wn.2d 1022 (1994)), *review denied*, 140 Wn.2d 1022 (2000).

¶27  For purposes of reviewing this summary judgment, we assume, without deciding, that Labor Ready owed and breached a duty of reasonable care to Owens' foreseeable victims at the YWCA.[10] Accordingly, we turn to the issue of proximate cause, we take the facts in the light most favorable to Lynn, and we consider alternative grounds to support the trial court's ruling. *Coppernoll*, 155 Wn.2d at 296.

¶28 Proximate cause consists of two elements: cause-in-fact and legal causation. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). We address each in turn.

### 1. Cause-in-fact

¶29  Cause-in-fact is "a cause which in a direct sequence [unbroken by any new independent cause,] produces the [injury] complained of and without which such [injury] would not have happened." 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 15.01, at 181 (2005). Cause-in fact is generally a question for the jury. *Schooley*, 134 Wn.2d at 478. But on summary judgment, we review the record to determine whether the plaintiff has offered sufficient admissible evidence, which if proved,

---

[9] This test applies to both negligence in hiring and negligence in continued employment. *Betty Y. v. Al-Hellou*, 98 Wn. App. 146, 149 n.3, 988 P.2d 1031 (1999), *review denied*, 140 Wn.2d 1022 (2000).

[10] More specifically, for purposes of our review of this summary judgment, we accept, without deciding, Lynn's argument that (1) Labor Ready knew of Owens' criminal record and sex offender status, *see Betty Y.*, 98 Wn. App. at 149, and (2) it knew, or should have known, that placing Owens at the YWCA would bring him in contact with vulnerable women and children.

would support sufficient allegations of material fact to warrant sending the case to a jury.

### a. Inadmissible Hearsay

¶30 Labor Ready argues that (1) Lynn offered no admissible. evidence to show that Cordova and Owens met at the YWCA in January 2004; (2) excluding inadmissible hearsay, Lynn was "left with *no* evidence supporting her critical allegation that Cordova met Owens at the YWCA," Br. of Resp't at 34; and (3) thus, the trial court must have erroneously considered inadmissible testimony in ruling that there was an issue of material fact as to where Owens and Cordova met. We agree with Labor Ready's first and second arguments; therefore, we need not address the third.[11]

¶31 We agree with Labor Ready that much of the evidence Lynn offered to prove that Owens and Cordova met at the YWCA in January 2004 was inadmissible hearsay. Such evidence largely depended on several witnesses'[12] declarations about out-of-court statements they heard from Owens or Cordova, arguably implying where and when the two met.[13] This proffered evidence was classic inadmissible

---

[11] Because we affirm the trial court's dismissal of Lynn's negligence action against Labor Ready on alternate grounds, we need not address Labor Ready's cross appeal of the trial court's rulings on the admissibility of evidence.

[12] Lynn offered testimony of 11 witnesses to support her contention that Cordova met Owens at the YWCA Opportunity Place. These witnesses were Rebecca Rojas, Cordova's best friend; Pamela Van Sittert, Owens' ex-girlfriend; Gerald Ketchum, Washington Department of Social and Health Services caseworker for Cordova; Roland Akers, Community Liaison for Reclaiming Futures; Nicole Wagner, Seattle School District Family Support Worker; Othello Howell, social worker and therapist for Cordova; Pastor Richard Thompson; Margaret Baldarama, social worker for Cordova's son; Donald White, Cordova's friend; Vernon Torrey, Cordova's friend; Rene Bonds, Cordova' friend and YWCA employee; Michelle Phillips, Cordova's friend; Department of Corrections Officer Fermanis; and Karla Marifjeren and Patrick Phelps, long-time residents of the Jensonia.

[13] This inadmissible hearsay evidence implied that (1) Owens and Cordova might not have met until January, possibly at the YWCA and (2) Owens offered to help Cordova apply for YWCA housing through his "connections" there.

hearsay,[14] and it did not fall within any hearsay rule exception. *See* ER 804. A party cannot rely on inadmissible hearsay in response to a summary judgment motion. *Dunlap*, 105 Wn.2d at 535-36. Thus, as Labor Ready contends, Lynn did not offer sufficient admissible evidence to establish a causal connection between Labor Ready's placement of Owens at the YWCA and her subsequent murder at the Miller Community Center.

### b. Admissible, Nonhearsay

¶32 Lynn also offered arguably admissible, nonhearsay testimony tending to prove that Owens and Cordova had met each other at least by mid-February. Even assuming, without deciding, that this evidence was not hearsay, it was not sufficient to defeat summary judgment.[15] Although arguably *implying* that Cordova met Owens sometime before her February conversations with Bonds and Phillips,

---

[14] We acknowledge that not all of the evidence Lynn offered to prove that Cordova and Owens first met at the YWCA Opportunity Place was hearsay. She offered several witnesses to testify that the first time Cordova mentioned Owens to them was after January 2004, for example: (1) that before January 2004, Cordova never mentioned Owens to anyone; (2) before January 2004, no Jensonia residents observed Cordova and Owens together; and (3) Owens maintained a romantic relationship with Pamela Van Sittert until January 2004. Such statements were not hearsay; rather, they were witnesses' statements about their own observations of events.

But such statements did not tend to prove Lynn's threshold allegation—that Cordova first met Owens at the YWCA where Labor Ready had placed him. At best, Lynn raised only an arguable implication or tentative speculation that no relationship existed between Cordova and Owens before January 2004. Nonetheless, this evidence did not controvert the Jensonia clerk's observations of Cordova and Owens' relationship at the Jensonia, months before his placement at the YWCA in January.

[15] For example, Rene Bonds stated, "In February and March of 2004, I had frequent contact with Dori [Cordova]. This is the first time that Dori mentioned to me the name Larry," referring to Owens. CP at 311. And Cordova's friend and relative Michelle Phillips stated, "The first time Dori Cordova ever mentioned Lawrence Owens was when she called on her birthday which was February 12, 2004." CP at 312.

Other witnesses who testified about their first observations of Owens included: Margaret Baldarama, Cordova's son Troy's social worker; and Othello Howell, Cordova's counselor. Baldarama testified that Cordova first mentioned Owens in February 2004. Similarly, Howell testified that he first saw Owens in February 2004.

this evidence proved only that February 2004 was the first time Bonds and Phillips heard Cordova *mention* Owens' name. Nevertheless, even taking this evidence in the light most favorable to Lynn, it did not tend to prove that Owens and Cordova first met at the YWCA in January 2004.

¶33 Lynn also offered the following testimony from Gerald Ketchum:

> Although *I do not have any personal knowledge as to how Dori Cordova met Lawrence Owens,* I do know that Dori was looking for transitional housing in January of 2004 and that she was contacting multiple agencies including the YWCA facility called Opportunity Place.

CP at 1238 (emphasis added). Similarly, Lynn offered the testimony of community liaison Roland Akers that he happened upon Cordova on the street near the YWCA in January 2004. Taking Ketchum's and Akers' testimonies in the light most favorable to Lynn, they established only that Cordova was seeking housing in January 2004 and was seen one time in the vicinity of, but not at, the YWCA. This evidence did not raise a question of fact about whether Cordova actually went into the YWCA in January, let alone that she met Owens there at that time. Instead, Lynn asks us to engage in mere speculation about the possibility of such a meeting based on the testimonies of witnesses with no personal observation or knowledge that Cordova first met Owens at the YWCA in January 2004.

¶34 Summary judgment was appropriate where, as here, proof of Lynn's alleged factual causation required inferences that were remote or unreasonable. *Walters v. Hampton*, 14 Wn. App. 548, 556, 543 P.2d 648 (1975). The admissible evidence showed only that (1) Owens worked at the YWCA in January 2004 and (2) Cordova's acquaintance saw her in downtown Seattle somewhere near, but not at, the YWCA in January. A leap from this scant admissible evidence to an inference that Owens and Cordova met at the YWCA would be remote and unreasonable.

¶35 In contrast, there was direct, undisputed evidence that Owens and Cordova were neighbors at the Jensonia months before Labor Ready placed Owens at the YWCA to perform custodial work. The Jensonia's front desk attendant, for example, stated that (1) Owens moved into the Jensonia some time in September 2003, (2) Owens' apartment was less than 20 feet from Cordova's apartment on the same floor, and (3) he (the Jensonia desk attendant) saw Cordova and Owens together often in October 2003. This testimony was uncontroverted.

### c. Insufficient Admissible Evidence

¶36 Without sufficient admissible evidence that Owens and Cordova first met at the YWCA in January 2004, Lynn could not establish even an arguable chain of causation leading from Labor Ready's assumed breach of duty when it placed sex-offender Owens at the YWCA to his later murder of Cordova at a distant site unrelated to the YWCA. To prove cause-in-fact, Lynn had to be able to show that, but for Labor Ready's breach of duty, Owens would not have killed Cordova. *Hartley*, 103 Wn.2d at 778. On the record before us, Lynn has not met and cannot meet this burden.

¶37 Even considering the evidence in the light most favorable to Lynn, *Coppernoll*, 155 Wn.2d at 296, there is insufficient admissible evidence for a reasonable jury to find that Owens and Cordova met at the YWCA in January 2004. *Walters*, 14 Wn. App. at 556.

### 2. Legal causation

¶38 Lynn further argues that the trial court erred by ruling that she did not establish legal causation. Br. of Appellant at 45. This argument also fails.

¶39 Legal causation is a question of law. *Kim v. Budget Rent A Car Sys., Inc.*, 143 Wn.2d 190, 204, 15 P.3d 1283 (2001). The court must decide " 'whether, as a matter of policy, the connection between the ultimate result and

the act of the defendant is too remote or insubstantial to impose liability.' " *Minahan v. W. Wash. Fair Ass'n,* 117 Wn. App 881, 890, 73 P.3d 1019 (2003) (quoting *Medrano v. Schwendeman,* 66 Wn. App. 607, 611, 836 P.2d 833 (1992)), *review denied,* 151 Wn.2d 1007 (2004).

¶40 For an employer to be liable for his employee's intentional acts, the association between the victim and the employee must be occasioned by the employee's job. *C.J.C. v. Corp. of the Catholic Bishop of Yakima,* 138 Wn.2d 699, 723, 985 P.2d 262 (1999). As we discuss above, Lynn could not support with admissible evidence her assertion that Owens and Cordova first met at the YWCA when he was employed there in January. Therefore, Lynn cannot raise a question of fact that Owens and Cordova's relationship was occasioned by Owens' job at the YWCA. This deficiency is further underscored by uncontroverted evidence that Owens and Cordova had already known each other at the Jensonia, months before Labor Ready employed Owens and placed him at the YWCA.

¶41 Because Lynn did not link any breach of duty by Labor Ready to an unbroken chain of causation connected with Cordova's murder, the trial court properly ruled that she did not establish legal causation and it correctly dismissed Lynn's negligence claim. *See La Plante v. State,* 85 Wn.2d 154, 159, 531 P.2d 299 (1975).

## C. Conclusion

¶42 Lawrence Owens tragically took the life of Dori Cordova, leaving her young son without his mother. But Labor Ready was not responsible for this murder. Assuming, without deciding, that Labor Ready owed and breached a duty to YWCA patrons, such as Cordova, when it placed Owens at the YWCA, Lynn's negligence claims do not survive summary judgment because she did not raise a question of material fact concerning a cause-in-fact connection between Labor Ready's assumed breach and Owens' off-site murder of Cordova. We hold, therefore, on this

alternative ground,[16] that the trial court properly dismissed Lynn's wrongful death and negligence action on summary judgment.

## II. SANCTIONS

¶43 Labor Ready argues that the trial court's sanctions against Lynn were insufficient in light of the magnitude of her discovery violations and misrepresentations. Labor Ready asks us (1) to remand to the trial court to increase these sanctions and (2) to impose additional sanctions on appeal for Lynn's misrepresentations to this court, many of which repeat the misrepresentations that the trial court attributed to inadvertence below. We address each argument separately.

### A. Trial Court

¶44 The trial court has broad discretion to impose sanctions. We review such sanctions for abuse of discretion. *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006); *State ex rel. Quick-Ruben v. Verharen*, 136 Wn.2d 888, 903, 969 P.2d 64 (1998). Applying this deferential standard of review, we find no abuse of discretion and affirm the trial court's sanctions.

### B. Appeal

¶45 Lynn repeats on appeal some of the misrepresentations that she previously attributed to sloppy legal work in the trial court. In addition, Lynn has included in her opening brief numerous misrepresentations and inappropriate quotations taken out of context,[17] causing our court, and presumably Labor Ready as well, to waste considerable time checking for their accuracy.

---

[16] We can affirm the trial court's ruling on an alternative ground.

[17] See, for example, the list of Lynn's purported misrepresentations that Labor Ready attached to its brief of respondent/cross-appellant.

¶46 Accordingly, we grant Labor Ready's request for sanctions against Lynn's counsel on appeal. We direct our commissioner under RAP 18.9(a): (1) to determine reasonable attorney fees under RAP 18.1 and costs Labor Ready incurred for responding to these misrepresentations and to impose sanctions or terms as appropriate and (2) to determine reasonable sanctions payable to this court.

¶47 Affirmed.

BRIDGEWATER and ARMSTRONG, JJ., concur.