204 P.3d 271 (2009)
Teresa RUCSHNER, as Guardian ad Litem for M.H., a minor,[] Appellant,
v.
ADT, SECURITY SYSTEMS, INC.; Puget Sound Protection, a Washington corporation; Security One, Inc.; and Michael L. Robinson II, and American Security Services, LLC, a Washington company, Respondent.
No. 36890-1-II.
Court of Appeals of Washington, Division 2.
April 7, 2009.
*272 Stephen Louis Bulzomi, Messina Bulzomi Christensen, University Place, WA, James Wesley McCormick, Messina Bulzomi Christensen, Tacoma, WA, for Appellant.
Thomas Raymond Merrick, Philip Randolph Meade, Merrick Hofstedt & Lindsey PS, Seattle, WA, for Respondent.
Michael L. Robinson II, Appearing Pro Se.
HUNT, J.
¶ 1 Teresa Rucshner, individually and as a guardian ad litem for minor rape victim MH, appeals the trial court's summary judgment dismissal of her negligent hiring action against defendants Puget Sound Protection; ADT Security Systems, Inc.; and American Security Services, LLC. Rucshner argues that the defendants owed and breached a duty of care by failing to perform a criminal *273 background check on an employee, Michael Robinson,[1] who raped 14-year-old MH two months after he met her while making a PSP sales call at her home. PSP argues that the trial court properly dismissed Rucshner's negligent hiring action against PSP because (1) PSP did not violate any duty to MH that proximately caused her injuries, (2) PSP's actions were not a proximate cause of Robinson's criminal conduct toward MH, and (3) PSP did not have a duty to control Robinson at the time that Robinson assaulted MH.[2]
¶ 2 Holding that there remains an issue of material fact as to whether there was a causal connection between PSP's hiring Robinson without conducting a criminal background check and his rape of MH, we reverse the summary judgment dismissal of Rucshner's negligent hiring action against PSP and remand for trial. We affirm the trial court's summary judgment dismissal of Rucshner's action against defendants ADT and American Security Services.

FACTS

I. Background Facts

A. PSP's Security Services Agreement with ADT
¶ 3 Puget Sound Protection (PSP) is an authorized security services dealer for ADT Security Systems, Inc. (ADT). PSP employs door-to-door "promotional representatives" to make house calls to sell residential alarm systems. PSP team leaders drive the promotional representatives to various neighborhoods in company vans; these team leaders, who are essentially on-site sales managers, remain in the company vans nearby in case the representatives need assistance.
¶ 4 PSP executed three successive dealer agreements with ADT  in 1998, 2002, and 2004  to make sales calls to residences and to install ADT alarm systems. In both the 2002 and the 2004 agreements with ADT, PSP warranted that all employees performing services under these agreement had passed a drug screen and criminal a background check. The 2002 contract provided:
17.6.3 Background Screens. Authorized Dealer represents and warrants that all of its employees utilized to perform services under this Agreement have successfully passed a drug screen and a criminal background check, and, if applicable, have current drivers' licenses. Authorized Dealer agrees that it shall produce certification satisfactory to ADT upon ADT's request that Authorized Dealer has complied with the terms of this paragraph. Authorized Dealer consents and authorizes ADT to conduct a reasonable background check of Authorized Dealer and any non-ADT personnel utilized by Authorized Dealer in the performance of services hereunder, if ADT so elects. Authorized Dealer shall cooperate with and provide to ADT such information as ADT shall reasonably [sic] in carrying out such background checks.
Clerk's Papers (CP) at 835 (emphasis added). The same language appeared in the 2004 agreement.
¶ 5 Both the 2002 and the 2004 agreements also included a provision for the "Actions of Employees," which stated:
17.6.1 Actions of Employees. All persons employed by Authorized Dealer [PSP] are the employees and agents of Authorized Dealer and not of ADT. Authorized Dealer shall be solely responsible for the acts, negligence and omissions of its employees and agents, and shall have sole responsibility for their supervision, direction and control.
CP at 835; 875.
¶ 6 This agreement authorized PSP (1) to sell and to install "Electronic Event Detection Devices" in residential and small commercial customers' premises, (2) to obtain *274 duly executed service agreements with residential and small commercial customers, (3) to tender service agreements exclusively to ADT for purchase, and (4) to provide subcontracting services for ADT. Additionally, this agreement required PSP to honor all commitments to customers and subscribers and to provide "the highest quality of customer service."

B. ADT's Expectations for PSP's Hiring Process
¶ 7 According to Ronald Book, ADT's territorial manager, the dealer agreements generally warrant that the Authorized Dealer[3] "will run background checks" on all its employees. The purpose for conducting such background checks is to determine whether job applicants "have criminal activity in their past" because "if you don't hire [applicants with a criminal record], they can't [ ] interact with anyone, your employees or the public." CP at 540(p24). Although ADT does not specify what Authorized Dealers should look for in a background check, ADT does establish that Authorized Dealers need to conduct the checks so that they (Authorized Dealers) know what kind of person they are hiring.
¶ 8 Book was not aware that PSP had failed to conduct background checks and drug screens before hiring new employees. But had he known that PSP was not conducting these background checks and drug screens, Book said he would have advised PSP to conduct them because, according to Book, "anyone running any kind of business, especially that deals with the public, should be informed about the criminal record of their employees." CP at 541(p28).
¶ 9 Similarly, according to ADT's Regional Director for the Western United States, David Smiley, although employee background checks were not an established industry standard, the language of ADT's current Authorized Dealer contracts established that Authorized Dealers, such as PSP, need to run criminal background checks as part of their contractual agreements with ADT. ADT's February 9, 2002 agreement with PSP included the provision warranting that PSP would conduct background checks and drug screens for its employees. Based on this agreement, ADT required PSP to conduct background checks of its employees. This agreement was in effect at the time that PSP employee Robinson raped MH.

C. PSP's Hiring Process
¶ 10 PSP required all prospective employees to fill-out a criminal history section on the bottom of its "Authorization and Release" form. This section required applicants to answer the following questions: (1) Have you ever been convicted of a crime or convicted in military court? (2) Have you ever been sanctioned or had your license suspended or revoked? (3) Are you currently under investigation or pending charges? PSP's application process also required employees to complete an affidavit, containing the following provision: "I understand that I may be required to successfully pass a drug screening examination and consent to a pre- and post-employment drug screening as a condition of employment." CP at 462(p25); Ex. E.
¶ 11 Although PSP warranted to ADT that all its employees had successfully passed drug screen and criminal background checks, PSP did not, in fact, conduct such tests for all employees. Rather, PSP team leaders made hiring decisions and exercised discretionary power over whether to conduct background checks on new PSP applicants, including promotional representative applicants. According to PSP's general manager, Clyde Stephenson, (1) PSP's high turnover rate made it costly and impractical to perform background checks on every applicant;[4] (2) PSP generally did not require drug screens and criminal background checks for lower-level employees; (3) he did not know about Robinson's criminal background; and (4) if PSP had known about Robinson's criminal record, it would not have hired him.

*275 D. PSP's Employment of Robinson
¶ 12 Michael L. Robinson completed all of PSP's application materials, checking the box marked "no" for each of the three questions about his criminal history. Robinson did not disclose and PSP neither checked nor discovered that, contrary to his assertions, Robinson actually had criminal convictions for: (1) first-degree criminal impersonation, (2) third-degree theft, (3) possession of drug paraphernalia, and (4) possession of marijuana. Moreover, during the time that Robinson was applying for a job at PSP, an additional charge was pending against him, ultimately resulting in a conviction for second-degree theft.
¶ 13 In spite of the lack of a background check, on August 26, 2003, PSP hired Robinson to work as a promotional representative to make door-to-door sales of ADT security services. After PSP hired Robinson, he worked in various neighborhoods selling ADT security services and generally reporting to PSP's Federal Way office for instructions.

E. Robinson's Rape of Juvenile at Home After PSP Sales Call
¶ 14 In early 2004,[5] after working for PSP for almost one year, Robinson was part of a PSP crew selling ADT security services in the Parkland/Spanaway area. During one of the sales calls, Robinson knocked on Sandra H's door. When Sandra H answered, she told Robinson that she had purchased ADT services in the past but she no longer dealt with the company because of a bad experience. She then closed the door on Robinson. He then visited the next house.
¶ 15 When Robinson finished soliciting the rest of the block, he began walking back up the road to wait for the company van. MH, Sandra H's daughter, called out to him from the first floor window of the house where he had earlier made a sales call. Robinson walked over to the window to speak with MH, and MH told him that she felt bad about her mother's earlier rude behavior. Robinson asked MH how old she was, and MH responded that she was 14 years old. MH then asked Robinson how old he was, and he told her he was 20-years-old, which was his real age.[6] Robinson told MH that they should "hang out sometime" and asked what she thought about that. MH told Robinson that it would not work for her because he was "way too old."
¶ 16 Robinson asked MH for her phone number, repeating how much he wanted to see her again. According to MH, she refused to give Robinson her number,[7] closed her bedroom window, and began to clean her room. Five to 10 minutes later, MH heard a knock on the window, saw Robinson there again, and apparently reopened the window. Robinson said, "[A]re you sure you don't want to give me your number[?]" MH again said, "No." Robinson responded that he just wanted someone to talk to while he waited for the company van. MH stood near the window, talking to Robinson for several minutes until the van arrived and Robinson left.
¶ 17 A few weeks later, Robinson called MH to ask again if she wanted to "hang out." MH asked Robinson how he had gotten her number, but he ignored her question and insisted that they should "hang out" sometime. Again, MH told Robinson that she could not see him because of their age difference. According to MH, Robinson's phone call scared her because she had never given him her phone number, and it was not listed in the phonebook.
¶ 18 Nevertheless, over the course of several weeks, Robinson called MH repeatedly to see if she wanted to "hang out" with him. Because Robinson was so repetitive and insistent, MH "figured it might have something to do with sexual [intentions] and it just scared [her] more." CP at 584(32). During these conversations, Robinson's tone was "aggressive" and "fierce" such that it appeared to MH that he would do what he *276 wanted regardless of whether she agreed to it. Consequently, MH always told Robinson to stop calling, and she sometimes hung up on him.
¶ 19 Approximately two months after Robinson's PSP sales call to MH's home, Robinson called MH at 11:00 am and said that he was "going to come over today." This call scared MH "[b]ecause he was a grown man, two or three times [her] size and [she] was scared for [her] wellbeing." CP at 586(p37). Nevertheless, MH told no one about Robinson's call, because she did not think that he would actually come to her house. As a precaution, however, MH locked all the doors and closed the blinds in the home.
¶ 20 A few hours later, Robinson arrived at MH's home while she was watching television. MH's mother was not at home. MH heard the doorbell ring, looked outside her bedroom window, and saw Robinson standing by the door. MH did not answer the door or communicate with Robinson. Instead, she brought both of her family's dogs into the bedroom with her and sat on her bed. A few second later, MH's phone rang, and she did answer it because she thought it was Robinson. Robinson kept knocking on the front door; the dogs ran to the front door and began to bark. Then MH heard Robinson knocking on her bedroom window, so she left the room and went into the kitchen. Next, Robinson began to knock on the sliding glass door in the kitchen; during this time, "the phone just kept ringing and ringing." According to MH, even though the call transferred to the answering machine several times, "it's like it never stopped ringing." Finally, MH answered the phone; Robinson identified himself, told MH he was at her door, and asked her to let him in. MH refused to let Robinson inside. Robinson then told her, "[L]et me in or I'll find my own way in." CP at 587(p46).
¶ 21 MH looked out the window again and saw Robinson put his cell phone in his pocket and walk toward her home from the direction of a neighbor's property. MH went to the front door and cracked it open. Robinson pushed the door open, entered the home, hugged MH, and then went into the kitchen and asked for a soda. In the kitchen, Robinson grabbed MH by the legs and pulled her close to him. MH tried to push him off, but he had a firm grip. Robinson pulled MH on to his lap and held her "very tightly" so that she could not move. MH told Robinson that he needed to leave, but he said that he could not leave without his keys, which he claimed were in MH's bedroom.[8] MH got up, and Robinson pushed her in the direction of her bedroom, grabbing her around her stomach.
¶ 22 Robinson opened MH's bedroom door, "dragged" her inside, grabbed MH by the wrist, pulled her on top of him onto the bed, rolled on top of MH, pinned her arms against the bed, and began to kiss her. MH struggled, but Robinson pushed her face into the pillow and held her tightly, leaving bruises on her arms and above her eye. Although MH continued to struggle, Robinson performed oral sex on MH and vaginally raped her. During this time, MH, who had been a virgin, was crying; she felt pain and repeatedly told Robinson "no," but she could not get up because Robinson had pinned her to the bed.
¶ 23 After half an hour, Robinson got up from the bed and said to MH, "[T]hat wasn't so bad, was it?" MH continued to cry in her bed. Robinson told MH, "[Y]ou know this was all your fault, don't you?" He said he had to go to work, picked up his keys from the floor, and left. After crying in bed for a few more minutes, MH walked to a friend's house and told the friend that she had been raped by a guy who had previously been to her house to sell security services. At her friend's urging, MH told her mother, Sandra H, that she had been raped. Sandra H immediately took MH to the hospital, where a doctor observed several bruises on MH's arms and face.

F. Robinson's Arrest, Conviction, and Prison Sentence
¶ 24 Several days later, Robinson called MH and said that he wanted to see her *277 again. Having coordinated with the police to be present in her home to arrest Robinson if he attempted to return, MH agreed with Robinson that he could come over the next morning at 9 am. The next day, Robinson arrived at MH's home around 8:30 am and knocked on her door. Because the police officers had not yet arrived, Sandra H hid in her bedroom and called 911, while MH let Robinson into the home. Robinson had brought some marijuana with him and asked MH if she wanted to smoke it, but she declined, telling Robinson that he could smoke it on the back porch. Moments later, MH and Robinson heard a knock on the door; the police officers entered the home and arrested Robinson.
¶ 25 Robinson claimed that the sexual contact he had had with MH was consensual. MH denied that she had consented, asserting in her deposition that Robinson had forcefully raped her. Regardless, MH was too young to consent to sexual intercourse with Robinson.
¶ 26 On June 28, 2004, the State charged Robinson with rape in the third degree, rape of a child in the third degree, and unlawful possession of a controlled substance (40 grams or less of marijuana). On January 4, 2005, the State amended the information, and on January 5, Robinson pleaded guilty to third degree rape and unlawful possession of a controlled substance. The superior court sentenced Robinson to prison and ordered him to have no further contact with MH.

II. Procedure: Resultant Civil Lawsuit

A. Initial Pleadings; Summary Judgment Dismissal of Plaintiff's Claim
¶ 27 On behalf of her minor daughter, MH, Sandra H sued ADT, PSP, Security One, Inc., and Robinson for personal injuries and damages in tort for negligently hiring Robinson and sending him out to make home sales of security systems.
¶ 28 ADT answered the complaint and cross claimed against the other defendants for full statutory contribution and all damages, fees, costs, and other losses sustained as a result of the other defendants' comparative fault. PSP also answered the complaint. Apparently Robinson never answered the complaint;[9] and the trial court eventually entered a default judgment against him. The record before us contains no information about whether Security One filed an answer. Ultimately, however, the parties stipulated to dismiss Security One as a defendant.
¶ 29 The trial court granted Sandra H's motion to amend her complaint to add PSP's parent company, American Security Services, LLC (American Security), as a defendant. American Security answered the complaint and asked the trial court to dismiss it with prejudice.
¶ 30 Then ADT, PSP, and American Security filed a joint motion for summary judgment dismissal of Sandra H's action. After Sandra H filed a response,[10] the trial court granted the defendants' summary judgment motion and dismissed Sandra H's action.
¶ 31 Rucshner appeals dismissal of her negligent hiring action.[11]

ANALYSIS
¶ 32 Rucshner contends that the trial court erred in granting the defendants' motion for summary judgment and dismissing her tort action for negligently hiring Robinson. She argues that: (1) PSP owed a duty of care to prevent its employees from endangering customers, (2) PSP breached this duty of care *278 by failing to conduct a background check when it hired Robinson, and (3) PSP proximately caused MH's injuries as a result of this breach. To the extent that breach of duty and causation are issues of fact requiring a trial, we agree.
¶ 33 The record demonstrates the following undisputed facts: (1) In its contract with ADT, PSP represented and warranted that it conducted background/criminal checks and drug screens on all of its employees; (2) PSP did not conduct a criminal background check before or after hiring Robinson; (3) Robinson had a criminal history at the time PSP hired him, with a new charge pending; and (4) Stephenson, PSP's general manager, testified that he would not have hired Robinson had he known about his criminal record. We hold as a matter of law that: (1) by virtue of its contract with ADT, PSP voluntarily assumed a duty of care not to hire employees with criminal records; (2) in hiring Robinson, who had a criminal record, without conducting a criminal background check, PSP breached this duty of care; and (3) there remain questions of fact for the jury about whether this breach proximately caused MH's injuries and, if so, the amount of her resultant damages.

I. Standard of Review
¶ 34 We review summary judgment orders de novo and perform the same inquiry as the trial court. Mohr v. Grant, 153 Wash.2d 812, 821, 108 P.3d 768 (2005). We will affirm the trial court's summary judgment when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party was entitled to summary judgment as a matter of law. Id.

II. Negligent Hiring
¶ 35 To prove negligent hiring, the plaintiff must demonstrate that (1) the employer knew or, in the exercise of ordinary care, should have known of the employee's unfitness at the time of hiring; and (2) the negligently hired employee proximately caused the plaintiff's injury. Carlsen v. Wackenhut, 73 Wash.App. 247, 252, 868 P.2d 882 (citing Peck v. Siau, 65 Wash.App. 285, 288, 827 P.2d 1108 (1992), review denied, 120 Wash.2d 1005, 838 P.2d 1142 (1992)), review denied, 124 Wash.2d 1022, 881 P.2d 255 (1994).

A. Foreseeability
¶ 36 Foreseeability limits the scope of the duty owed because actors are responsible for only the foreseeable consequences of their acts. Schooley v. Pinch's Deli Market, Inc., 134 Wash.2d 468, 477, 951 P.2d 749 (1998) citing Burkhart v. Harrod, 110 Wash.2d 381, 395, 755 P.2d 759 (1988). If a risk is unforeseeable, an actor generally has no duty to prevent it. See Higgins v. Intex Recreation Corp., 123 Wash.App. 821, 837, 99 P.3d 421 (2004). But when an employee is acting outside the scope of employment, the relationship between the employer and the employee gives rise to a limited duty, owed by the employer to foreseeable victims, "to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others." Betty Y. v. Al-Hellou, 98 Wash.App. 146, 149, 988 P.2d 1031 (1999) (citing Niece v. Elmview Group Home, 131 Wash.2d 39, 48, 929 P.2d 420 (1997)), review denied, 140 Wash.2d 1022, 10 P.3d 403 (2000).

B. Duty to Conduct a Criminal Background Check

1. Contractual Duty
¶ 37 Rucshner argues that PSP's agreement with ADT created a duty to customers such as MH, which PSP breached by failing to conduct Robinson's criminal background check and drug screening. We agree.
¶ 38 Rucshner relies on Kelley v. Howard S. Wright Construction Co., to support her argument. 90 Wash.2d 323, 582 P.2d 500 (1978).[12] There, our Washington State Supreme *279 Court: (1) held that a contract between a construction site owner and a general contractor created a duty of care between the owner and a subcontractor; and (2) noted that past Washington decisions support the proposition that an affirmative duty assumed by contract may create liability to persons not a party to the contract "where failure to properly perform the duty results in injury to them." Kelley, 90 Wash.2d at 334, 582 P.2d 500. Kelley applies here.
¶ 39 Similarly, in its contract with ADT, PSP expressly undertook a duty to conduct criminal background checks on all its employees.[13] The 2002 and 2004 contracts both contained provisions for "Background Screens"; these provisions stated:
Authorized Dealer [PSP] represents and warrants that all of its employees utilized to perform services under this Agreement have successfully passed a drug screen and a criminal background check....
CP at 835. PSP's contractual warranty that "all of its employees" had undergone criminal background checks and drug screens creates a genuine issue of material fact as to whether PSP's breach of this contractual duty proximately caused the harm to MH.

2. Risk of Harm to Customers
¶ 40 Rucshner also argues that PSP negligently hired Robinson because it knew, or should have known, that employing Robinson without conducting a criminal background check posed a risk of harm to its customers. We have already held that a genuine issue of material fact exists as to PSP's contractual duty to perform criminal background checks on its employees. Nevertheless, we also reach Rucshner's causation argument to point out that a genuine issue of material fact also exists on the issue of foreseeability of harm of the type that Robinson caused here.

a. State v. Carlsen

¶ 41 Based on our holding in Carlsen, Rucshner contends that PSP negligently hired Robinson by failing to conduct a background check that would have revealed his criminal history. 73 Wash.App. 247, 868 P.2d 882. In Carlsen, we noted that Washington courts tend to employ a balancing test to determine whether the given employment warrants the extra burden of a thorough background check. Carlsen, 73 Wash.App. at 256, 868 P.2d 882 (citing La Lone v. Smith, 39 Wash.2d 167, 172, 234 P.2d 893 (1951) (Although one may normally assume that another who offers to perform simple work is competent, there is a special duty to investigate if the work is likely to subject the third person to a serious risk of great harm. 1 Restatement 464, Agency § 213)).
¶ 42 The Carlsen plaintiff was attending an event at the Tacoma Dome and approached a member of the event staff for help in finding her friends. Carlsen, 73 Wash.App. at 248, 868 P.2d 882. The staff member, named Futi, led her underneath the bleachers and tried to rape her. Id. at 248-49, 868 P.2d 882. Authorities later discovered that Futi had lied on his employment application, falsely stating that he had no criminal record when in fact he had several convictions and multiple outstanding warrants for violent crimes, including robbery. Id. at 251, 868 P.2d 882. In Carlsen, we reversed the trial court's dismissal of the plaintiff's action, concluding that a jury might well find that it was reasonable for concert patrons to view Futi as part of the security staff and, thus, Futi's employer should have more extensively examined Futi's background before hiring him. Id. at 256, 868 P.2d 882.
¶ 43 Like the instant case, Carlsen involved a contract between PSP and ADT, which directly mirrors the language of the contract provision for "Background Screens" at issue here.[14]
*280 ¶ 44 The pertinent portion of this contract provided:
17.6.3 Background Screens. Authorized Dealer [PSP] represents and warrants that all of its employees utilized to perform services under this Agreement have successfully passed a drug screen and a criminal background check, ...
CP at 835. PSP used the same language in its contract in Carlsen that it used here, warranting that it conducted criminal background checks on all employees.
¶ 45 We acknowledge that, unlike Carlsen's violent criminal record, if PSP had conducted a criminal background check on Robinson, it would have discovered only non-violent crimes: criminal impersonation, theft in the third degree, and possession of marijuana and drug paraphernalia. Similarly, Robinson's second-degree-theft conviction, which was pending when he applied for a job at PSP, did not include an element of force or threat of force.
¶ 46 Nevertheless, the facts are undisputed that Robinson had this criminal record and that PSP did not conduct a background check. Regardless of whether PSP would have hired Robinson and sent him with a PSP team into a residential area to sell ADT alarm systems door to door, had it been aware of his criminal record, there remains a question of fact about whether PSP's hiring of Robinson proximately caused MH's injuries.

b. Betty Y. v. Al-Hellou

¶ 47 Additionally, although Rucshner contends that Al-Hellou is inapposite, our analysis in Al-Hellou is instructive. 98 Wash. App. at 149, 988 P.2d 1031. In Al-Hellou, we determined that employers can be liable for an employee's misconduct when the job duties "facilitate or enable" the offense. Id. Al-Hellou worked for a company to renovate a vacant apartment building. Id. at 148, 988 P.2d 1031. The employer hired Al-Hellou despite knowing that he had been convicted of child molestation in Texas. Id. at 147, 988 P.2d 1031. At the apartment site, Al-Hellou met 14-year-old JMY and paid him to sweep the floors. Id. at 148, 988 P.2d 1031. During one of JMY's visits to the building, Al-Hellou took him back to his (Al-Hellou's) home and raped him. Id.
¶ 48 In its analysis of whether Al-Hellou's employer owed a duty to JMY, we discussed another Washington case, Peck v. Siau, which involved a student who sued the school for negligent hiring after being sexually assaulted by a teacher. Al-Hellou, 98 Wash. App. at 149, 988 P.2d 1031 (citing Peck, 65 Wash.App. at 287-88, 827 P.2d 1108). We distinguished Peck from Al-Hellou, noting that in Peck, the school hired the teacher specifically to work with young people, the teacher's contact with the victim occurred on work premises, and the contact occurred precisely because "both the employee and the victim were required to be on the work premises." Al-Hellou, 98 Wash.App. at 149-50, 988 P.2d 1031 (citing Peck, 65 Wash.App. at 287, 827 P.2d 1108).
¶ 49 We determined that, unlike the employer in Peck, Al-Hellou's employer was not liable for the employee's misconduct because (1) the employer did not hire Al-Hellou to work with people; (2) the rape did not occur on the work premises; and (3) "the job duties did not facilitate or enable Al-Hellou to commit the rape" when the victim, who did not live at the apartment building, happened to meet Al-Hellou there. Al-Hellou, 98 Wash.App. at 149, 988 P.2d 1031 (citing Niece, 131 Wash.2d at 48, 929 P.2d 420) (holding that an employer owes a duty to foreseeable victims, "to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others."). In reaching this conclusion, we noted that the contact on work premises was fortuitous, unlike in Carlsen, where the victim approached the guard because he was a guard, and unlike in Peck, where the contact between teacher and student was inevitable. Al-Hellou, 98 Wash.App. at 150, 988 P.2d 1031.
*281 ¶ 50 The same distinctions apply here. Like the situation in Peck, the contact between Robinson and PSP customers was inevitable. PSP hired Robinson to work with people, to go door-to-door to customers' homes, and to make sales calls at their private residences. Although the purpose of Robinson's work was to sell services to adult customers, working in a door-to-door setting necessarily put him into contact with children and anyone else who happened to be present in the home.
¶ 51 For this reason, unlike the situation in Al-Hellou, Robinson's contact with MH was not completely fortuitous. Although it was MH who first contacted Robinson after he had finished making sales calls in the neighborhood, the impetus for this contact was Robinson's recent sales call at MH's home: MH's purpose in contacting Robinson was to apologize for how her mother had acted when he had earlier solicited her business. Robinson also identified himself as the "ADT guy" when he called MH several months later. Although Robinson's subsequent contact with MH did not involve any company materials or conveyances, it arguably occurred on the functional equivalent of "work premises" because Robinson's work site was the door-to-door setting of his customers' homes, including MH's home. Accordingly, in addition to whatever duty PSP owed under its contract with ADT, a genuine issue of material fact remains as to whether PSP owed a limited duty to MH to prevent the tasks, premises, or instrumentalities entrusted to Robinson from endangering MH.
¶ 52 In light of our reversal and remand for trial, we do not address Rucshner's additional argument that under the Restatement (Second) of Torts, a "special relationship" existed between PSP and its customers, which gave rise to a duty that PSP breached by failing to check Robinson's criminal record. Restatement (Second) of Torts § 315 (1965).

C. Issue of Fact for the Jury[15]
¶ 53 Finally, Rucshner argues that PSP's failure to conduct a criminal background check proximately caused MH's injuries. We do not address on appeal whether this omission proximately caused harm to MH because, in part, this is an issue of fact for the jury.
¶ 54 For legal responsibility to attach to negligent conduct, the claimed breach of duty must constitute the proximate cause of the injury. Marshall v. Bally's Pacwest, Inc., 94 Wash.App. 372, 378, 972 P.2d 475 (1999). Proximate cause contains two elements: cause in fact and legal causation. Hartley v. State, 103 Wash.2d 768, 777, 698 P.2d 77 (1985). Accordingly, proximate cause is a mixed question of law and fact. Rasmussen v. Bendotti, 107 Wash.App. 947, 955, 29 P.3d 56 (2001).
¶ 55 As to the factual inquiry, a cause in fact refers to the actual, "but for," cause of injury, which involves a determination of some physical connection between an act and an injury that is generally left to the jury. Schooley, 134 Wash.2d at 478, 951 P.2d 749. Although a logical, causal connection between an act and the consequence of that act satisfies the cause-in-fact prong of proximate cause, a legal determination of whether liability should attach to that act is necessary to satisfy the legal causation prong. See Hartley, 103 Wash.2d at 778-79, 698 P.2d 77
¶ 56 Legal causation rests on policy considerations as to how far the consequences of the defendant's acts should extend. Id. at 779, 698 P.2d 77. The legal causation analysis focuses on whether, as a matter of policy, the connection between the ultimate result and the defendant's act is too remote or insubstantial to impose liability. Schooley, 134 Wash.2d at 478-79, 951 P.2d 749.
¶ 57 As Rucshner argues, an employer's liability is not "necessarily limited to conduct performed within the scope of employment or during work hours, as long as *282 there is a causal connection between the plaintiff's injury and the fact of the agency relationship." C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wash.2d 699, 723-24, 985 P.2d 262 (1999) (discussing Marquay v. Eno, 139 N.H. 708, 719, 662 A.2d 272 (1995)). We note that the causal connection between PSP's act of hiring Robinson without a background check and the harm to MH two months after Robinson's sales visit to her home is somewhat attenuated, especially as compared to the chain of events in CJC. Nevertheless, in our view, whether this connection was too attenuated or whether it was a cause in fact of MH's injuries is a question for the trier of fact to resolve, not the court.[16]
¶ 58 Rucshner's "but for" argument posits that a logical nexus flows between PSP's failure to screen Robinson for prior criminal acts and Robinson's criminal contact with MH. But unlike the non-contractual facts in Al-Hellou, PSP can be liable for the harm that Robinson caused if the jury finds that PSP "enabled or facilitated" his harmful conduct. PSP argued that the fact that Robinson, standing outside of Sandra H's home, came into contact with MH was completely fortuitous. On the contrary, it is undisputed that PSP sent Robinson to the home of Sandra and MH specifically to make contact with an adult for the purpose of soliciting her to purchase an ADT alarm system. Whether Robinson's job or duties facilitated or enabled him to rape MH is a question of fact for the jury, not an issue of law for the court, in spite of the legal causation prong of proximate cause.
¶ 59 By virtue of the PSP-ADT contract's representation that PSP conducted criminal background checks on its employees, Rucshner has shown that (1) PSP should have known about Robinson's criminal record and unfitness for the job at the time of hiring, Carlsen, 73 Wash.App. at 256, 868 P.2d 882; (2) PSP did not conduct a background check of Robinson; and (3) PSP hired Robinson anyway.[17]
¶ 60 Holding that there remains a genuine issue of material fact on the issue of whether PSP's hiring Robinson and sending him to MH's neighborhood without first conducting a criminal background check, we reverse the trial court's summary judgment dismissal of Rucshner's negligent hiring action against PSP and remand for trial on the factual issues of (1) whether PSP's breach of its duty to conduct a criminal background check on Robinson before hiring him proximately caused MH's actionable injuries; and (2) if so, her damages. We affirm the trial court's summary judgment dismissal of Rucshner's negligent hiring action against ADT and American Security Services.
We concur: HOUGHTON, J., and VAN DEREN, C.J.
NOTES
[] The nature of this case requires some confidentiality. Accordingly, under RAP 3.4, we do not use the name of the juvenile party.
[1] This appeal does not involve any claim by Rucshner against Robinson, against whom the trial court entered a default judgment.
[2] Defendants ADT, PSP, and American Security originally filed a cross appeal, seeking review of this default judgment, which inadvertently noted that it was against the "defendants," plural, rather than against only Robinson. Ruschner subsequently stipulated to correct this default judgment by removing the inadvertent plural reference. The remaining defendants note in their brief that this correction resolves the cross appeal, which is, therefore, no longer before us.
[3] The "Authorized Dealer" here was PSP.
[4] Stephenson stated, "[I]t didn't make mathematical sense to do a background check on everybody before you hire them because you don't even know if they're going to come back for the first day of training." CP at 468(p46).
[5] According to Sandra H, Robinson first came to her door in March or April of 2004. The appellant's brief (after Rucshner replaced Sandra H), states that the incident occurred approximately two months before June 21, 2004. PSP's brief places the date in "early 2004."
[6] According to Robinson, MH said she was a 17-year-old senior at Franklin/Pierce High School.
[7] According to Robinson, MH wrote her number on scratch paper and gave it to him.
[8] The record suggests that Robinson used his keys as a ploy to persuade MH to go into the bedroom with him.
[9] Although the record on appeal is silent about this fact, Rucshner's briefing notes that Robinson failed to file an answer.
[10] The trial court denied Sandra H's motion to strike the defendants' motion for summary judgment, under CR56(f), in which she had asked the trial court to allow further discovery and to allow the case to proceed to trial.
[11] Sandra H previously filed a notice of discretionary review of the trial court's dismissal of her claims against ADT and PSP. A commissioner of this court denied discretionary review. We denied Sandra H's motion to modify the commissioner's ruling denying discretionary review.

When Sandra H died on October 2, her sister, Teresa Rucshner, obtained custody of MH. The trial court granted plaintiff's counsel's petition to appoint Rucshner as guardian ad litem for MH. Rucshner then substituted for Sandra H in this action on MH's behalf.
[12] To support this argument, Rucshner primarily relies on a Georgia case for the proposition that a dealer agreement between an authorized dealer of security services and the security company gives rise to a duty to conduct criminal background checks. Underberg v. S. Alarm, Inc., 284 Ga.App. 108, 109, 643 S.E.2d 374 (2007) (citing Tallahassee Furniture Co., Inc. v. Harrison, 583 So.2d 744 (1991); McGuire v. Arizona Prot. Agency, 125 Ariz. 380, 609 P.2d 1080 (1980)); Br. of App. at 42. We agree with PSP that Underberg does not resolve the issues before us here.
[13] Thus, the following facts are irrelevant to the issues of fact here: When asked whether ADT requires dealers to conduct background checks, Smiley responded that dealers in the state of Washington "don't have to do background checks." Smiley also noted that industry standards do not require employee background checks. Finally, ADT's territorial manager Ronald Book explained that ADT has no specific guidelines or expectations about how to conduct a criminal background check.
[14] Similarly, PSP's contractual undertaking to conduct criminal background checks of its employees precludes our having to explore the realm of foreseeability that arose in Carlsen from the inconsistencies in his employment application. Nor, in light of PSP's contractual duty, need we address Rucshner's additional argument that PSP owes a heightened duty to conduct criminal background checks because it hires employees, like Robinson, to sell services at customers' homes.
[15] That Robinson's physical contact with MH occurred approximately two months after his initial PSP sales contact with her mother at their home, and his first contact with MH, is but one factor the jury can consider in determining whether PSP's breach of its duty to conduct a criminal background check proximately caused the injuries that Robinson inflicted on MH.
[16] We note that the instant case is distinguishable from Lynn v. Labor Ready, Inc., 136 Wash. App. 295, 151 P.3d 201 (2006). In Lynn, Labor Ready's employee, Owens, had an extensive criminal history; Labor Ready, like PSP here, failed to conduct a criminal background check. 136 Wash.App. at 300, 151 P.3d 201. Owens met the victim, Cardova, at a residential apartment building where they both lived. Id. Later, they both moved into a shelter, where Owens killed Cardova. Concluding that Lynn had failed to offer sufficient proof to establish a causal connection between Labor Ready's placement of Owens at the YMCA and Lynn's subsequent murder at a nearby (and unaffiliated) housing shelter, we held that the trial court properly dismissed Lynn's negligence action on summary judgment. Id. at 312-13, 151 P.3d 201.

Rucshner's case is factually distinguishable from Lynn for at least two reasons. First, Robinson met MH during his door-to-door PSP sales calls; in contrast, Owens and Cardova met at their apartment building, totally disassociated from either of their independent connections with defendant YMCA. Second, Owens killed Cardova in a different location that was not his job site at the YMCA; in contrast, Robinson raped MH at the same place where PSP had previously sent him to sell ADT security servicesMH's home.
[17] PSP cannot avoid its contractual duty to conduct this background check based on Robinson's representation on his employment application that he had no criminal record.