[No. 25583-2-III. Division Three. February 26, 2008.]

JOHN ("JACK") HILL ET AL., *Appellants*, v. SACRED HEART MEDICAL CENTER ET AL., *Respondents*.

*Robert J. Crotty*; and *Darrell W. Scott* and *Matthew J. Zuchetto* (of *The Scott Law Group, PS*), for appellants.

*Carole L. Rolando* and *Keith D. Brown* (of *Randall & Danskin, PS*); *Pamela A. Okano* and *Michael N. Budelsky* (of *Reed McClure*); *Geana M. Van Dessell, Benjamin S. Coleman*, and *Brian T. Rekofke* (of *Witherspoon Kelley Davenport & Toole, PS*); and *Mary H. Spillane* (of *Williams Kastner & Gibbs*), for respondents.

¶1 SWEENEY, C.J. — This is a medical malpractice case. The court concluded that the plaintiffs failed to show the necessary qualifications of their experts and that the plaintiffs' affidavits were not sufficient to show a causal relationship between any breaches of the duty of care and the plaintiffs' injury. We conclude that the plaintiffs have met their threshold burden of producing sufficient evidence. And we reverse the summary dismissal of their complaint and remand for trial.

## FACTS

BACKGROUND

¶2 John Hill underwent bilateral knee surgery at Sacred Heart Medical Center in June 2004. Dr. Timothy Lovell, his orthopedic surgeon, ordered Lovenox injections for nine

consecutive days following surgery. Lovenox is a heparin compound used to prevent blood clots.

¶3 Sacred Heart nurses cared for Mr. Hill throughout the nine days of the Lovenox injections. A nurse noted a rash and bruising at the injection site (the lower left quadrant of Mr. Hill's abdomen) and suggested that the wound be assessed.

¶4 Drs. Judy Benson, Judy Swanson, Louise Harder, Bryce Andrus, and Klaus Gottlieb, among others, cared for Mr. Hill beginning on the third day of the Lovenox treatment. Drs. Benson and Swanson were Mr. Hill's attending physicians. They both specialize in internal medicine. Drs. Harder and Andrus were residents in internal medicine at the hospital. Drs. Benson and Swanson supervised them. Dr. Gottlieb is an internist specializing in gastroenterology. He was called in by Dr. Andrus to investigate a possible bowel obstruction.

¶5 Neither Dr. Swanson nor Dr. Benson visited or examined Mr. Hill after the fifth day of the injections. Dr. Andrus reported increased hardening of the skin around Mr. Hill's lesion at the Lovenox injection site after eight days of injections. He examined Mr. Hill in the morning on the ninth day and noted that Mr. Hill's platelet count had dropped 70 percent in two days. He also reported that Mr. Hill's injection site had blistered.

¶6 Dr. Gottlieb examined Mr. Hill on July 1, the ninth day of the Lovenox treatment. His medical record reflects that he noted a "large blood blister" at the site of the Lovenox injections. But the record does not reflect that Dr. Gottlieb reviewed Mr. Hill's medical chart.

¶7 Dr. Harder cared for Mr. Hill on the evening of the ninth day. She noted a black blister measuring eight centimeters by three centimeters at the injection site. She also noted that Mr. Hill was pale, confused, drowsy, short of breath, and difficult to rouse. Dr. Harder recorded that Mr. Hill was not likely experiencing a pulmonary embolism. She ordered unfractionated heparin after midnight on the

tenth day after a telephonic consultation with Dr. Swanson. Someone then ordered that Mr. Hill be taken off of heparin-based anticoagulants approximately 10 hours later.

¶8 That day, Mr. Hill suffered a stroke,[1] a pulmonary embolism,[2] and deep vein thrombosis.[3] Physicians later concluded that Mr. Hill suffered a cerebrovascular accident.[4] It resulted in paralysis on the right side of his body and his inability to speak. Heparin-induced thrombocytopenia (HIT) can trigger such significant life- or limb-threatening venous and/or arterial thromboembolisms.[5] HIT is an immune-mediated reaction to heparin.

¶9 Health care providers estimate the probability that a patient has HIT by evaluating and assigning point values to a patient's platelet fall, the timing of onset of platelet fall, the presence/absence of thrombosis[6] or other sequelae, and the presence/absence of other cause(s) of platelet fall. Mr. Hill had the maximum score when assessing the probability of HIT on the ninth day of Lovenox injections.

SUMMARY JUDGMENT PROCEEDINGS

¶10 The Hills sued Sacred Heart and all of the physicians involved in Mr. Hill's care for damages. They alleged medical negligence for the failure to properly monitor,

---

[1] A stroke is a "[s]udden loss of consciousness followed by paralysis caused by one of several different mechanisms including hemorrhage into brain; formation of an embolus or thrombus that occludes an artery; or rupture of an extracerebral artery causing subarachnoid hemorrhage." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1890 (17th ed. 1993) (hereinafter TABER'S).

[2] A pulmonary embolism is an obstruction of a blood vessel in the lungs by foreign substances or a blood clot. TABER'S, *supra*, at 623.

[3] Deep vein thrombosis is the formation, development, or existence of a blood clot within a deep vein in the leg or pelvis that may be asymptomatic or be accompanied by symptoms that include swelling and pain. TABER'S, *supra*, at 1990-91.

[4] A cerebrovascular accident is a stroke. TABER'S, *supra*, at 352.

[5] Thromboembolism is the blocking of a blood vessel by a particle that has broken away from a blood clot at its site of formation. TABER'S, *supra*, at 1988.

[6] Thrombosis is "[t]he formation, development, or existence of a blood clot or thrombus within the vascular system." TABER'S, *supra*, at 1990.

diagnose, and treat Mr. Hill's condition. Sacred Heart and some of the physicians (Dr. Andrus, Dr. Gottlieb, Dr. Benjamin M. Muir, the Rockwood Clinic, Dr. Lovell, Dr. Pugh, Dr. Benson, Dr. Swanson, and Dr. Harder) moved for summary judgment.

¶11 The Hills responded with the affidavits of experts. They submitted the affidavit of Kenneth Bauer, MD. He is a hematologist. Dr. Bauer teaches at Harvard Medical School. He is the Chief of Hematology at the VA Boston Healthcare System and the Director of Thrombosis Clinical Research at Beth Israel Deaconess Medical Center. He is also a member of a number of relevant medical societies.

¶12 He reviewed the records of Mr. Hill's care. He testified that the standard for the physicians responsible for this case was a national standard and it therefore applied to all of the physicians involved here. And he testified that the standard had been violated here.

¶13 The Hills also submitted the affidavits of Kaye-Eileen Willard, MD. She is a Wisconsin internist. Dr. Willard is board certified in internal medicine and currently practices that specialty in Wisconsin. She did her residency in internal medicine in the state of Washington. And she practiced medicine in Washington for over 20 years until 1999. Dr. Willard has worked in multispecialty group practices in Washington and Wisconsin and is familiar with the practices of a gastroenterologist.

¶14 Dr. Willard was also "familiar with the standard of care for . . . protecting the patient from the significant adverse effects of [prescribed] drugs. . . . [T]his standard is a national standard and through [her] own medical practice and continuing medical education, [she is] aware that the Washington standard of care in 2004 was the same as the national standard of care." Clerk's Papers (CP) at 250-51. Her affidavit says that the standard applies to physicians, including internal medicine physicians. Dr. Willard testified that the standard of care was violated here and proximately caused Mr. Hill's injuries. CP at 253-54.

¶15 Finally, the Hills submitted the affidavit of Candice Mohar, RN, PhD. She is a nurse. She said the nurses violated applicable standards of care for nurses and that these factors contributed to Mr. Hill's injuries.

¶16 The trial judge concluded that Nurse Mohar was not competent to provide evidence on medical causation, as a matter of law, because of our decision in *Colwell v. Holy Family Hospital.*[7] The judge also concluded that (1) Dr. Willard's affidavit was insufficient to adequately describe the 2004 standard of care for an internal medicine resident since her information was based upon experience 20 years earlier; (2) Dr. Bauer did not have sufficient expertise in the area of residents or resident supervision; (3) Dr. Willard failed to show competency in the specialty of gastroenterology and, therefore, could not express opinions on the care Dr. Gottlieb rendered.

¶17 The trial judge then dismissed the Hills' action against Sacred Heart and Drs. Andrus, Benson, Swanson, Harder, and Gottlieb.

## DISCUSSION

¶18 We review an order granting summary judgment de novo. *Seybold v. Neu*, 105 Wn. App. 666, 675, 19 P.3d 1068 (2001). Summary judgment in favor of a defendant is appropriate only if the plaintiff fails to produce sufficient evidence which, if believed, would support the essential elements of his or her claim. *Id.* at 676. We view the evidence and any inferences that may be drawn from that evidence in a light most favorable to the nonmoving party. *Miller v. Jacoby*, 145 Wn.2d 65, 71, 33 P.3d 68 (2001) (citing *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989)). An expert's qualifications and opinions are part and parcel of a summary judgment. *Seybold*, 105 Wn. App. at 678; *see Folsom v. Burger King*, 135 Wn.2d 658, 663,

---

[7] *Colwell v. Holy Family Hosp.*, 104 Wn. App. 606, 15 P.3d 210 (2001) (nurse not qualified to testify on the element of causation in a medical malpractice case; testimony from a licensed physician was essential on the issue of causation).

958 P.2d 301 (1998). We do not, then, defer to the trial judge's rulings on evidence when passing on the propriety of a summary dismissal. We decide whether evidence is sufficient or should have been considered and to what extent. *Folsom*, 135 Wn.2d at 663.

¶19 The plaintiff, here the Hills, must show that "[t]he health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances," and "[s]uch failure was a proximate cause of the injury complained of." RCW 7.70.040(1), (2). The plaintiff in a medical malpractice case must generally produce expert testimony to establish the standard of care and most aspects of causation. *Harris v. Robert C. Groth, MD, Inc.*, 99 Wn.2d 438, 448-49, 663 P.2d 113 (1983); *Seybold*, 105 Wn. App. at 676.

### COLWELL V. HOLY FAMILY HOSPITAL

¶20 We have previously made the categorical statement that nurses are not competent to testify to causation in a medical malpractice action. *Colwell*, 104 Wn. App. at 612. But we now question that holding. There is nothing in the statutory scheme that suggests that a nurse should be categorically denied the right to express opinions on the proximal relationship between a breach of a duty of care and an injury. *See* ch. 7.70 RCW. Certainly, if the failure to meet the standard of care is the physician's, then a physician will most likely be required to pass on whether the breach of the standard of care caused a particular injury. RCW 7.70.040(1). But if the breach of the standard of care is the standard of a reasonable nurse, we fail to see why a nurse could not offer opinions that the nursing failures resulted in a given injury. RCW 7.70.040(1). Indeed, expert testimony is not even required if a reasonable person can infer a causal connection from the facts and circumstances and the medical testimony given. *Douglas v. Freeman*, 117 Wn.2d 242, 252, 814 P.2d 1160 (1991).

¶21 The scope of the expert's knowledge, not his or her professional title, should govern "the threshold question of admissibility of expert medical testimony in a malpractice case." *Pon Kwock Eng v. Klein*, 127 Wn. App. 171, 172, 110 P.3d 844 (2005). A physician with a medical degree is qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist, so long as the physician has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue in the medical malpractice action. *Morton v. McFall*, 128 Wn. App. 245, 253, 115 P.3d 1023 (2005).

PROXIMATE CAUSE

¶22 Sacred Heart argues, and the trial judge concluded, that Nurse Mohar was not qualified to express an opinion on the relationship between the nursing care Mr. Hill received and his injury. Sacred Heart also argues that Dr. Willard could not rely on the affidavit of Nurse Mohar to express opinions on the proximal relationship between the nursing failures and the injury here.

¶23 But we need not decide that question here, nor did we need to decide the question in *Colwell*. A witness may testify as an expert if he or she possesses knowledge, skill, experience, training, or education that will assist the trier of fact. ER 702. Here, Nurse Mohar is a trained nurse. She has over 30 years of experience in the nursing field, both as a nurse and as a nurse educator. She holds a PhD in nursing. And she is familiar with the standards of nursing in Washington and, specifically, standards of appropriate nursing vigilance, clinical nursing practice, and system errors in nursing.

¶24 Again, to recover damages for medical negligence, the plaintiff must establish that (1) the health care provider breached the accepted standard of care and (2) the breach was a proximate cause of the injury complained of. RCW 7.70.040. The issue is whether the Hills' experts established the second element.

¶25 Mr. Hill suffered the following injuries: venous and arterial thrombotic complications, including stroke, pulmonary embolism, and deep vein thrombosis. This left him with paralysis on the right side of his body, expressive aphasia, weakness and fatigue, the inability to blink his left eye, skin necrosis, inability to walk, and mood swings.

¶26 Expert testimony from a medical doctor will generally be necessary to establish causation in a medical malpractice case. *Harris*, 99 Wn.2d at 448-49; *Seybold*, 105 Wn. App. at 676. The testimony must be based on the facts of the case and not speculation. *Seybold*, 105 Wn. App. at 677. It must also be based on a reasonable degree of medical certainty. *McLaughlin v. Cooke,* 112 Wn.2d 829, 836, 774 P.2d 1171 (1989). Expert medical testimony must demonstrate proximate cause.

¶27 Nurse Mohar certainly had the necessary knowledge, skill, experience, training, and education to establish the standard of care for nurses and to say whether those standards were violated here. The failure claimed here on the part of the physicians and the nursing staff is to recognize the symptoms of thrombocytopenia, diagnose the condition, and then properly manage that condition.

¶28 A proximate cause of an injury is a cause which, in a direct sequence that is unbroken by any new independent cause, produces the injury complained of and without which such injury would not have happened. *Hertog v. City of Seattle*, 138 Wn.2d 265, 282-83, 979 P.2d 400 (1999). Proximate cause has two elements: (1) cause in fact and (2) legal causation. *Lynn v. Labor Ready, Inc.*, 136 Wn. App. 295, 307, 151 P.3d 201 (2006). Both elements must be satisfied. *AAS-DMP Mgmt., L.P. v. Acordia Nw., Inc.*, 115 Wn. App. 833, 63 P.3d 860 (2003).

¶29 To establish the cause in fact, the plaintiff must show that he or she would not have been injured but for the health care provider's failure to use reasonable care. *McLaughlin*, 112 Wn.2d at 837. And the affidavits of the Hills' experts relate the failures here to the injury and resulting damage.

¶30 Dr. Willard testified that:

10. The following are some of the standard of care violations identified by [the] Affidavit of Candice Mohar, R.N[.,] that, if true, would have contributed to Mr. Hill's HIT being undiagnosed before his catastrophic injuries manifested: failing to ensure that a wound assessment was performed for the site of the Lovenox injections after requesting a wound assessment on June 29th and 30th; failing to ensure a physician evaluated and considered the significance of Mr. Hill's dramatic platelet count drop on the morning of July 1st.

11. The standard of care violation identified by Candice Mohar, regarding Sacred Heart Medical Center's failure to adequately train its nurses on HIT, if true, would have contributed to Jack Hill's HIT being undiagnosed before his catastrophic injuries manifested.

CP at 253-54. Dr. Bauer testified that:

Had Mr. Hill's medical providers promptly recognized the thrombocytopenia, determined that it was attributable to Lovenox, discontinued Lovenox, and placed Mr. Hill on a non-heparin based anti-coagulant, it is more likely than not that Mr. Hill would not have suffered the catastrophic consequences he sustained from HIT.

CP at 138.

¶31 Sacred Heart argues that Dr. Willard's references to Nurse Mohar's affidavit do not show the necessary legal causation between the nursing failures and the injury here. And generally the affidavits must set forth facts based upon personal knowledge admissible as evidence that the affiant is competent to testify. CR 56(e). "However, evidence may be presented in affidavits by reference to other sworn statements in the record such as depositions and other affidavits." *Mostrom v. Pettibon*, 25 Wn. App. 158, 162, 607 P.2d 864 (1980).

¶32 Here, Dr. Willard testified that the nursing failures identified by Nurse Mohar resulted in Mr. Hill's HIT being undiagnosed. She further posits that the nurses probably contributed to HIT being undiagnosed by failing to ensure

that a doctor performed a wound assessment on Mr. Hill's lesion; that they probably contributed to HIT being undiagnosed by failing to ensure that a doctor evaluated and considered the significance of the drop in Mr. Hill's platelet count; and that they probably contributed to HIT being undiagnosed by failing to adequately train its nurses about HIT. This, for us, is an ample showing that the failure to diagnose HIT is what caused the injury to Mr. Hill.

¶33 Nurse Mohar posits that the nurses should have been trained to recognize and should have recognized HIT and determined that the symptoms were attributable to Lovenox. The nurses here, along with the physicians, were health care providers. RCW 7.70.020(1).

¶34 Dr. Bauer's affidavit refers to health care providers. It also asserts that "[t]he administration of unfractionated heparin to Jack Hill, while Mr. Hill was manifesting the signs and symptoms of . . . HIT . . . contributed to the injuries and complications suffered by Mr. Hill." CP at 138. Nurse Mohar said Sacred Heart nurses violated their standard of care when they failed to "properly administer . . . Lovenox." CP at 145. Dr. Bauer's opinions on causation then apply to Sacred Heart.

¶35 The nurses administered the unfractionated heparin to Mr. Hill. And any administration of unfractionated heparin would not have been proper: "When there is a high clinical likelihood of HIT, heparin or low molecular weight heparin must be discontinued . . . to protect the patient from thrombotic events." CP at 138. Dr. Bauer's affidavit goes on to state: "Instead of discontinuing all heparin containing products, Mr. Hill's health care providers placed him on unfractionated heparin, which placed Mr. Hill at great risk for suffering a major thrombotic complication." CP at 138.

¶36 Mr. Hill's injuries were then, on this showing, a direct result of the administration of heparin-based anticoagulants. Continued administration of heparin increased Mr. Hill's risk of injury. The nursing failures are then, on this record, a cause of the injury here.

¶37 We conclude that there is a sufficient showing of a relationship between the breaches of care alleged by the Hills and the resulting injury to avoid summary dismissal of the Hills' complaint against Sacred Heart Medical Center.

STANDARD OF CARE

 ¶38 The trial judge agreed with the doctors (Benson, Swanson, Andrus, Harder, and Gottlieb) that the Hills' experts lacked expertise on residents, resident supervisors, and as gastroenterologists. But "residents" and "supervisors" are not professions, they are titles. *Pon Kwock Eng*, 127 Wn. App. at 172. And so whether Dr. Willard or Dr. Bauer holds those titles should not dictate whether they can express opinions on how to diagnose and treat HIT. Moreover, gastroenterological practices and procedures are not at issue in this case. The area of expertise being questioned is general internal medicine. So lack of familiarity with gastroenterological practices and procedures is not determinative. Resp'ts' Br. (Klaus Gottlieb, MD, and Klaus Gottlieb, MD, PLLC) at 18, 22-24. Dr. Gottlieb was a practicing physician examining Mr. Hill's external wound on the lower left quadrant of his abdomen as part of a consult for a possible bowel obstruction.

¶39 The questions required by the statutory scheme are: (1) Is the expert a physician with a medical degree? and (2) Did the expert produce sufficient facts to demonstrate his or her familiarity with HIT as a medical problem and the procedures for diagnosing and treating HIT? RCW 7.70-.040(1).

¶40 And we pass on the threshold question of whether the Hills have met their burden of *production. Renz v. Spokane Eye Clinic, PS*, 114 Wn. App. 611, 623, 60 P.3d 106 (2002). The weight that should be attributed to these opinions—the burden of *persuasion*—is a matter for the trier of fact. *Id.*

¶41 First, all of the physicians here have medical degrees. And all of the physician defendants here practice

internal medicine in one form or another. The Hills' experts, Dr. Willard and Dr. Bauer, both have medical degrees and both practice in the area of internal medicine.

¶42 Second, the medical problem at issue is HIT. The medical procedures at issue then are those for recognizing and treating HIT. Dr. Gottlieb argues that the medical procedure at issue, for him, is a bowel obstruction or, more accurately, an examination limited to bowel obstruction. But the Hills do not allege that Dr. Gottlieb failed to properly evaluate for bowel obstruction. They allege and show instead that he failed to perform procedures that a physician should perform when confronted with the symptoms Mr. Hill presented. The question is then whether Dr. Willard and/or Dr. Bauer were competent to testify as to the diagnostic and treatment procedures for a patient who presents symptoms like those Mr. Hill presented. When the issue is so phrased and we consider the affidavits in a light most favorable to the Hills, that answer is obvious. Reasonable inferences drawn from the experts suggest that both are familiar with HIT and the procedures to diagnose and treat HIT.

¶43 Dr. Willard's affidavit says that she is a medical doctor who specializes in internal medicine and has been practicing for more than 20 years. Internists diagnose and treat diseases affecting adult internal organs and systems. A reasonable inference drawn from this fact is that Dr. Willard is familiar with blood-related diseases, including HIT. Another inference is that she is familiar with diagnosing and treating HIT.

¶44 Dr. Bauer's affidavit supports that he is familiar with HIT and HIT-related procedures. He is a chief of hematology. He is the Director of Thrombosis Clinical Research at Beth Israel Deaconess Medical Center. He is an expert in the areas of thrombosis, hemostasis, and hematology.[8] He has, then, extensive experience studying blood

---

[8] "Hemostasis" is the "stoppage or sluggishness of blood flow." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1056 (1993). "Thrombosis" is "the formation or presence of

and blood diseases. The necessary inference from this experience is that he is familiar with HIT, a blood-related disease. Another necessary inference is that he is familiar with the procedures for diagnosing and treating HIT. And both Drs. Bauer and Willard say that a review of Mr. Hill's medical records would have shown the problem and any internist should have known the appropriate course of action—discontinue the heparin therapy.

¶45 Both Dr. Willard and Dr. Bauer belong to the same profession and practice in the same area as the defendant physicians here. Their knowledge of the medical problem and procedures at issue, diagnosing and treating a patient presenting symptoms like Mr. Hill did, is uncontested. Dr. Willard and Dr. Bauer were, then, competent to testify as to the standard of care in this case as to all physicians.

¶46 Dr. Willard's and Dr. Bauer's affidavits show that the applicable standard of care is the national standard. The standard of care in Washington is, then, the same standard as in their states. The same standard that applies to Dr. Willard in Wisconsin and to Dr. Bauer in Massachusetts applies to physicians here in Washington.

¶47 In sum, then, the affidavits here show that the applicable standard of care required the physicians to:

- suspect HIT,
- perform a wound assessment,
- review the patient's blood work,
- recognize an abnormal lab report,
- report abnormal lab results to the supervisor's attention,
- be aware of the known risks of the prescribed medication,
- monitor blood platelets for a postoperative patient on Lovenox,
- be alert to the signs of potential complications from those medications,
- diagnose HIT,

---

a blood clot within a blood vessel." WEBSTER'S, *supra*, at 2384. "Hematology" is a medical science that deals with the blood and blood-forming organs. WEBSTER'S, *supra*, at 1054.

- determine that Mr. Hill's symptoms were caused by an adverse reaction to Lovenox,
- discontinue heparin-based medications immediately,
- administer a non-heparin based anticoagulant promptly,
- ensure compliance with the applicable standard of care,
- ensure that Mr. Hill's medical care is not left in the hands of unsupervised residents,
- attend to the patient,
- supervise residents,
- ensure that residents evaluate lab work properly, and
- supervise Mr. Hill's medical condition closely.

¶48 The physicians do not challenge the procedures required by the applicable standards of care. Dr. Andrus argues that Dr. Willard's opinion on the standard of care does not identify the group to which it applies. Resp'ts' Br. (Sacred Heart Medical Center and Bryce Andrus, MD) at 27. And the two residents, Dr. Andrus and Dr. Harder, urge us to adopt a lower standard of care for first-year residents. Resp'ts' Br. (Sacred Heart Medical Center and Bryce Andrus, MD) at 25-26; Resp'ts' Br. (Drs. Benson, Swanson, and Harder) at 12. They contend that a lower standard should apply to residents because residents are not like the other physicians here. Residents are not fully trained and require supervision.

¶49 Dr. Willard's first affidavit does not identify a group when setting forth the standard of care. But her supplemental affidavit does. There she says that the standard of care applies to physicians generally and to physicians practicing in internal medicine particularly. Dr. Willard's affidavit then does define the group to which the standard of care she cites to applies. It is sufficient that the group defined is a profession (physicians and internists) and not the title "resident." RCW 7.70.040(1) ("The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider . . . *in the profession or class* to which he belongs." (emphasis added)).

¶50 Washington does not recognize a lower standard of care for resident physicians. The term "health care provider" in RCW 7.70.040 is defined in relevant part as an employee or agent of "a person licensed by this state to provide health care." RCW 7.70.020(1), (2).

¶51 The affidavits of Drs. Willard and Bauer raise genuine issues of material fact when viewed in a light most favorable to the Hills. We reverse the summary dismissal of the Hills' complaint against Sacred Heart Medical Center, Dr. Bryce Andrus, Dr. Judy Benson, Dr. Judy Swanson, Dr. Louise Harder, and Dr. Klaus Gottlieb and remand for trial.

BROWN, J., and STEPHENS, J. PRO TEM., concur.