# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| LLACYE-FAY E. LINK, individually and on behalf of her minor daughter, AZLYNNE-FAY J. LINK, | No. 56524-2-II |
| Appellant, | |
| v. | |
| MULTICARE HEALTH SYSTEM, aka MARY BRIDGE CHILDREN'S HOSPITAL, a Washington nonprofit corporation; MARY BRIDGE CHILDREN'S FOUNDATION, aka MARY BRIDGE CHILDREN'S HOSPITAL, a Washington corporation; NORTHWEST CONGENITAL HEART CARE, in Affiliation with MEDNAX SERVICES, INC., a Florida corporation; NORTHWEST CONGENITAL HEART CARE, in Affiliation with PEDIATRIX CARDIOLOGY OF WASHINGTON, P.C., a Washington corporation; NORTHWEST CONGENITAL HEART CARE, in Affiliation with PEDIATRIX MEDICAL GROUP OF WASHINGTON, INC., P.S., a Washington corporation; N.W. PEDIATRIC CENTER, INC. P.S., a Washington corporation; SARAH C. SPENCER, ARNP, CPNP; MICHAEL K. PICKENS, D.O.; JOHN P. MCCLOSKEY, M.D.; and MATTHEW V. PARK, M.D., | UNPUBLISHED OPINION |
| Respondents. | |

CRUSER, A.C.J. – Llacye Link's daughter, AL, was born with a birth defect that can cause

narrowing of the trachea and esophagus. In October 2013, when AL was almost four months old,

she sustained severe brain injuries that have caused her to be entirely dependent on Link for her care. Link's then-boyfriend was charged with assault of a child in the first degree for causing those injuries and later pleaded guilty to assault of a child in the third degree with the aggravating circumstance that the injuries substantially exceeded the level of bodily harm necessary to satisfy the elements of the offense. Link sued AL's various medical providers for malpractice, alleging that complications from her birth defect, and the providers' failure to appropriately treat the defect, were a proximate cause of AL's injuries sustained in October 2013. Many of the defendants were dismissed on summary judgment. The remaining defendants proceeded to trial, after which the jury returned a defense verdict, finding that they were not negligent in their care for AL.

Link appeals the trial court's orders granting summary judgment to Sarah Spencer, a nurse practitioner who provided primary care to AL, Dr. Pickens, a gastroenterologist who treated AL on one occasion, and several nurses who were involved in treating AL when she was hospitalized prior to the October 2013 injuries.

We hold that Link's arguments are without merit and affirm the trial court's orders granting summary judgment to the defendants.

FACTS[1]

I. AL's BIRTH AND PRELIMINARY CARE

Llacye Link gave birth to AL on June 11, 2013. Prior to giving birth, Link underwent an obstetric ultrasound that revealed an aortic arch. However, due to the inability to completely image

---

[1] Throughout Link's brief, she references facts that were adduced at trial. Because Link does not challenge the verdict on appeal, all references to these facts (with the exceptions of the parties' positions at trial and the fact of the verdict itself) are stricken and will not be considered. In our de novo review of summary judgment, we are permitted to consider only those facts and materials submitted to the trial court for its consideration on summary judgment. *See* RAP 9.12.

the arch on the ultrasound, Link was referred to Dr. John McCloskey, a pediatric cardiologist at NorthWest Congenital Heart Care. In April 2013, when Link was about 30 weeks pregnant with AL, Dr. McCloskey performed a fetal echocardiogram that revealed a right aortic arch and what appeared to be an aberrant left subclavian artery, a type of vascular ring.[2] Dr. McCloskey noted that it would be appropriate to evaluate AL at several weeks of age to assess in better detail due to the limitations of fetal echocardiography.

Three days after AL's birth, Link took AL to Sarah Spencer, ARNP[3] at Northwest Pediatric Center for a newborn appointment to establish primary care. Spencer's assessment noted that AL was experiencing neonatal feeding problems and abnormal weight loss. Spencer assisted Link with a feeding and discussed the importance of frequent nursing. In addition, Spencer's counseling included an anticipatory guidance handout and discussion of safety practices, well-infant care, cerebral stimulation and activities, nutritional needs, and concerns about crying, including "PURPLE" crying: "Peak of crying occurs between 2 weeks and 2 months of age, . . . The crying is Unexpected and Unexplained, Resists common soothing measures, the baby has a Pain-like fac[e], the crying is Long-lasting, . . . and occurs primarily in the Evenings." Clerk's Papers (CP) at 4097. Spencer's notes further state that it is important to "take steps to ensure parental frustration is minimized. Never, ever shake the baby, as this can lead to severe brain damage and death." *Id.*

---

[2] A vascular ring is a birth defect involving arteries that are abnormally positioned around the trachea and the esophagus, which can cause narrowing of these structures. For example, a right aortic arch means that the blood vessel leaving the heart branches to the right side of the trachea rather than the left side.

[3] Advanced Registered Nurse Practitioner (ARNP).

Ten days after AL's newborn appointment, AL was seen by Dr. Matthew Park, another pediatric cardiologist at NorthWest Congenital Heart Care. The echocardiogram performed by Dr. Park confirmed a right aortic arch "but imaging was not conclusive as to the presence of an aberrant left subclavian artery[,] or vascular ring." *Id.* No other abnormalities were detected. Dr. Park noted that AL was having feeding issues and occasional vomiting. His letter to Spencer indicated that if AL continued to have feeding issues or poor weight gain, his office should be contacted to arrange for a CT angiogram for better imaging of the aortic arch. In addition, AL was to be reevaluated at his office in two months, but he noted "[s]he should be reevaluated sooner for any concerning respiratory distress, feeding difficulties, or poor weight gain." *Id.*

AL was seen by Spencer again four days later for her two-week well check. Spencer's assessment of AL included failure to thrive, neonatal feeding problems, and esophageal reflux. At the appointment, Spencer observed a 15-minute feeding, after which AL spit up 3 or 4 separate times within 10-15 minutes. It was unclear to Spencer whether AL's weight loss was due to calorie insufficiency or reflux. Spencer prescribed Zantac for reflux, instructed Link to supplement feedings with formula, and discussed how to position AL during feedings to reduce reflux. In addition, Spencer listed the same counseling as the prior appointment, including the detailed advisement about PURPLE crying and instruction to "[n]ever, ever shake the baby, as this can lead to severe brain damage and death." *Id.* at 4111. The home environment described in Spencer's progress notes indicated that AL "lives with [her] mom and grandmother," but the records do not reflect that Spencer was aware that Link's boyfriend, Kyle Davison, stayed at the home as well or provided care for AL. *Id.* at 4110.

II. AL'S JULY 2013 HOSPITALIZATION

About one month later, on July 24, Link took AL to the emergency room at Providence in Centralia, reporting that AL had been fussy and had vomited frequently over the previous two days. AL was transported to Mary Bridge Children's Hospital by ambulance. She was not accompanied by Link, and Dr. Edward Walkley, who treated AL at Mary Bridge, noted that "[r]eview of systems [was] limited by lack of mother's presence, and inability to get clear answers to questions[ o]ver the phone." *Id.* at 4122. The emergency department notes stated that AL was eating well at the hospital without difficulty and "clearly" had failure to thrive with poor weight gain. *Id.* at 4125. Dr. Walkley also spoke with Dr. Kim from NorthWest Congenital Heart Care, who relayed to Dr. Walkley that AL had "a right aortic arch and was felt to be at some risk for vascular ring." *Id.* (emphasis omitted). AL was admitted to Mary Bridge for further evaluation "[b]ased on the social situation and failure to thrive." *Id.* (emphasis omitted).

After admission, Link spoke with a doctor about AL's feeding issues. Link reported that AL had transitioned to formula and was feeding about 2 ounces every 3 hours, totaling about 16 ounces per day, but that AL vomited most feeds she was given. Because of AL's vomiting, Link had reduced AL's feedings from four ounces to two ounces. Link did not wake AL up during the night for feeding because AL slept through the night. There had also been two episodes of choking during feeds with AL turning blue in the face.

On July 25, the hospital performed upper gastrointestinal (GI) imaging, which revealed an indentation "along the posterior and right lateral aspect of the proximal esophagus," which was "concerning for vascular vein." *Id.* at 4127. The next day, a chest MRI confirmed that AL had a

right aortic arch with an aberrant subclavian artery "with associated narrowing of the tracheobronchial bifurcation at this level." *Id.* at 4128.

AL was discharged from Mary Bridge on July 27. The discharge team included Dr. Maurine Cobabe, a resident, and Dr. Andrew Reichert, who reviewed Dr. Cobabe's assessment and plan. The discharge notes indicate that AL's feeding at home had been decreased to too little volume per day with no overnight feeds, so Dr. Cobabe encouraged feeds every two hours, including at night, and increased the caloric content of AL's formula. On that regimen, AL had consistently gained weight while at the hospital. In addition, Link was encouraged to keep AL upright during feeds. Nurse Deana Johnson reviewed the discharge instructions with Link and provided Link with a Women, Infants, and Children (WIC) form allowing her to obtain an increase in formula so that she could feed AL 18 ounces per day.

The discharge assessment indicated that AL's failure to thrive was "most likely secondary to inadequate nutritional intake due to not being fed enough after feeds were decreased due to vomiting." *Id.* at 4142. In addition, AL's "[r]ight aortic arch might contribute to vomiting/reflux due to vascular ring, but this did not appear to create significant obstruction." *Id.* Link was instructed to follow up with GI in about a month to evaluate AL's vascular ring because it could become symptomatic when AL began eating solid foods. Nurse Mary Aubert scheduled this follow-up appointment for Link. Link was also instructed to follow up with cardiology as she had previously planned.[4] But the follow-up appointment notes state: "Please reschedule previously scheduled cardiology [appointment] to coincide with [the GI follow-up], as family lives far away."

---

[4] Link already had a follow-up appointment scheduled with cardiology for the following week but took AL to the emergency room prior to the appointment because of the severity of AL's vomiting and the choking episodes.

*Id.* at 4142. Mary Bridge staff also connected Link with a social worker to assist her in obtaining transportation to AL's appointments.

### III. OTHER APPOINTMENTS PRIOR TO OCTOBER 2, 2013

AL's previously-scheduled cardiology appointment for July 29 was cancelled because Link could not come that day. Nurse Myrna Ruffy's notes indicated that AL already had a GI appointment for August 20, so the cardiology appointment was to be rescheduled for August 27 because there was not availability to hold the appointments on the same day.[5]

On August 20, AL met with Dr. Michael Pickens at the Pediatric Gastroenterology Clinic at Mary Bridge Children's Health Center. Dr. Pickens noted that after feeding, AL had nasal reflux and was spitting up, but she was not vomiting. AL also made a wheezing sound, and Link expressed concern about other episodes of wheezing. Dr. Pickens prescribed Omeprazole and set a plan to schedule a swallow study as soon as possible. Dr. Pickens then referred AL back to Spencer "for primary care and anticipatory guidance." *Id.* at 921. The swallow study took place on August 27. At the study, AL exhibited "pediatric dysphagia characterized by a wet laryngeal cough on thin liquids and nasal reflux." *Id.* at 924. Following the study, Link was given recommendations on thickening AL's formula.

AL then attended a two-month well check with Spencer on September 9. At the time of the appointment, AL had a cold accompanied by coughing and "[a]cting fussy." *Id.* at 4131. AL received some vaccinations and Spencer prescribed albuterol for AL's cough. AL had an otherwise normal presentation. Spencer noted that AL was eating formula mixed with rice cereal, in an

---

[5] The record does not reflect whether this cardiology appointment on August 27 took place or, if not, why it did not take place.

amount of four and a half ounces every two to four hours during the day, and once during the night. AL was sleeping 12 hours at night with one feeding at about 6 a.m. AL was noted as having normal appetite, with no vomiting or diarrhea. Although AL was reported as having experienced nasal discharge and blockage for the previous two days, Spencer found no nasal discharge and found the nasal mucosa was normal.

AL's head was not yet steady in an upright position and was "still wobbily [sic] sometimes." *Id.* at 4132. With respect to the home environment, it was reported to Spencer that AL lived with her mother and maternal grandmother, and that her father was "not involved." *Id.* at 4131. As with previous appointments, there is no indication Spencer was told that an unrelated adult male was staying at the home or had access to AL. Spencer again advised Link about PURPLE crying, emphasizing the need to understand and prepare for it "to ensure parental frustration is minimized." *Id.* And Link was yet again instructed to "[n]ever, ever shake the baby, as this can lead to severe brain damage and death." *Id.*[6]

## IV. OCTOBER 2, 2013 INCIDENT

On the evening of October 2, 2013, AL suffered non-accidental, inflicted head trauma causing neurological failure while in the care of Link's boyfriend, Kyle Davison. Davison was charged with assault of a child in the first degree and ultimately entered a guilty plea to assault of child in the third degree with the aggravating circumstance that the injuries he caused "substantially exceed[ed] the level of bodily harm necessary to satisfy the elements of the offense." *Id.* at 937. Davison entered the plea because "[I]f the judge or jury heard and believed the evidence

---

[6] Link did not recall receiving any advisements against shaking AL because she knew "that's something you just don't do." *Id.* at 1269.

that was presented by the State, it is highly likely that I would be convicted, and I am taking this plea in order to take advantage of a favorable plea agreement." *Id.* at 944.[7]

In Davison's telling of the incident at his sentencing hearing, he and Link returned to Link's house that evening after eating at a Mexican restaurant. When they arrived home, Davison said he "wanted some weed so Llacye said she would go get some." *Id.* at 1599. Davison began feeding AL before Link left and, after Link left, Davison "changed [AL's] diaper, took her bottle from her[8] and started to put her PJs on." *Id.* Davison said that as he was putting AL's pajamas on, she spit up and began choking. Davison said that he started patting AL on her back, first putting her over his knee and then over his shoulder. AL went limp in his arms and was not breathing, and Davison began "freaking out." *Id.* Davison shook AL in what he said was an effort to wake her up, not "hard or out of anger." *Id.* The record does not reflect the duration of the shaking. Davison "realized nothing [he] was doing was working" so he ran next door to the neighbor's apartment for help. *Id.* at 1600. The neighbor performed CPR and called 911.

Following the assault, AL was transported to Morton General Hospital via ambulance. She was then transferred to Mary Bridge Children's Hospital for further care. At Mary Bridge, AL was found to have sustained acute subdural hematomas, ischemic changes, shearing injuries, and "extensive, bilateral retinal hemorrhages." *Id.* at 94. Reports following a consultation by an ophthalmology and retina specialist and a physical abuse consultation on October 3 and October 4, respectively, indicated that AL's injuries were consistent with inflicted head trauma. AL

---

[7] Davison was sentenced to 36 months in prison for this offense.

[8] In Davison's deposition in this case, he did not dispute that AL was prop fed on the night of October 2, 2013.

remained hospitalized at Mary Bridge until October 21, 2013. Following her discharge from Mary Bridge, AL spent approximately 10 months at a nursing care facility called Pope's Place.

At the time of Link's deposition in 2018, AL was entirely dependent on Link for her care, including bathing her, changing her, and positioning her. AL was tube fed, could not walk or crawl, and could not do anything on her own aside from moving her arms and legs.

## V. SURGICAL INTERVENTION FOR VASCULAR RING

A surgical conference was held at the end of October 2013 in which Dr. Park and other cardiologists, surgeons, and other healthcare staff determined that surgical intervention was not recommended at that time. This decision was made because the risks of performing surgery at AL's extremely young age outweighed the risk of simply leaving AL's vascular ring alone. Dr. Park explained that the younger the patient is, the greater the risk posed by the surgery. A second surgical conference was held on October 27, 2014, when AL was 16 months old. The conference was held after a bronchoscopy in March 2014 revealed "significant tracheomalacia and evidence of vascular compression." *Id.* at 4160. Another bronchoscopy following the surgical conference showed that AL's left bronchus, or airway to her left lung, had narrowed.[9] The surgery ultimately took place in November 2014, when AL was seventeen months old.

## VI. TRIAL COURT PROCEEDINGS

In 2017, Link brought a medical malpractice action against the various health care providers and clinics that treated AL prior to the October 2, 2013 incident. Relevant to this appeal, the claims were brought against ARNP Spencer, who provided primary care to AL; Dr. Pickens,

---

[9] Dr. Park testified that this type of compression would be concerning for breathing problems and chronic coughing or infections, but it would not cause any issues with swallowing.

the gastroenterologist that treated AL on August 20, 2013; Dr. Reichert, who oversaw AL's care during her July 2013 hospitalization; Dr. Park, a cardiologist with NorthWest Congenital Heart Care who performed an echocardiogram shortly after AL's birth and presented her case at the surgical conferences; Dr. Kim, another cardiologist with NorthWest Congenital Heart Care who assisted with AL's treatment during her July 2013 hospitalization; and three nurses—Johnson, Ruffy, and Aubert—from Mary Bridge Children's Hospital who were employed by MultiCare (MultiCare nurses) and treated AL during her July 2013 hospitalization.

Link alleged that AL's vascular ring caused AL to have difficulties with feeding and swallowing, as well as problems with breathing and wheezing, and that the collective failure of her providers to adequately treat these problems were the proximate cause of AL's injuries sustained on October 2, 2013. Link further alleged that the defendants' failure to perform adequate differential diagnoses or initiate appropriate treatment, including surgical correction of the vascular ring, led to AL's injuries.

Spencer and her employer, Northwest Pediatric Center, Inc., moved for summary judgment, arguing that Link could not establish causation of AL's injuries from Spencer's care because Spencer appropriately referred AL to follow-up appointments with Dr. Park and, even after the events of October 2, 2013, the attendees at the surgical conference later that month determined that surgery was not appropriate for AL at that time. Spencer and Northwest Pediatric Center, Inc. also argued that AL's neurological injuries were not caused by choking as a result of her vascular ring, as evidenced by Dr. Park's testimony that the narrowing of AL's bronchus would not have caused swallowing difficulties, and that Davison's assault of AL was a superseding cause of AL's injuries.

On the same day, Dr. Pickens, Dr. Reichert, and MultiCare moved for summary judgment, arguing that Link failed to identify any expert testimony that would support her claims and that Link could not establish causation between their care for AL and her injuries. Both Link and Davison testified that they regularly propped a bottle into AL's mouth to feed her, and Dr. Park's declaration submitted with the summary judgment materials explained that this was more likely than not the cause of AL's choking on the night of October 2, 2013, rather than her vascular ring. Dr. McCloskey, Dr. Park, and NorthWest Congenital Heart Care also moved for summary judgment, similarly arguing that Link had not presented any expert testimony in her witness disclosures that supported her claims.

Link responded to the motions with various declarations from experts regarding AL's injuries. Several of these experts contradicted each other on the nature of AL's injuries. *Compare id.* at 4370 ("[r]esuscitative shaking was one of the multifactorial causes that contributed to, along with hypoxia, aspiration and pneumonia, a cascade of events resulting in neurological devastation."),[10] *with id.* at 4192 (concluding that AL's injuries were due to thick milk that was suctioned out of her trachea, resulting in anoxia, rather than any shaking of AL, in part because "[t]he story that [Davison] gives is consistent with the medical history and records. In addition, the boyfriend does not change the story which is a common theme in nonaccidental trauma."). However, the common thread among the declarations and reports from Link's medical experts was that AL's brain injuries were proximately caused by the collective failure of the medical providers to advocate for or obtain surgery to correct AL's vascular ring.

---

[10] This report also stated that if AL's treatments had "brought an end to the incidents of choking on her feedings," then "resuscitative shaking would not have been invoked, and the injuries and neurologic damage that occurred on 10/2/2013 would not have happened." *Id.* at 4383.

The trial court granted summary judgment to Spencer and Northwest Pediatric Center. In addition, the trial court granted summary judgment to MultiCare as to the claim of corporate negligence. However, summary judgment was denied as to Drs. Reichert and Pickens, and the court stated it was not prepared to rule on claims against Dr. Cobabe[11] or the MultiCare nurses. Following a motion for reconsideration, the trial court granted summary judgment to Dr. Pickens and the MultiCare nurses. Lastly, the trial court granted summary judgment to NorthWest Congenital Heart Care as to the claim of corporate negligence, and it also granted summary judgment to Dr. McCloskey. However, summary judgment was denied as to Dr. Park.

The case later proceeded to trial with Link's claims against Dr. Reichert, Dr. Park, and Dr. Kim. Link claimed these defendants breached the standard of care by failing to seek "urgent surgical consultation to repair a congenital malformation of [AL's] aorta," and that this failure was the proximate cause of AL's brain injury. *Id.* at 3915. The doctors asserted, as a defense, that AL's brain injury was caused by Davison's negligence. The jury returned a verdict in favor of the defendants, answering no to the threshold question of whether any of the doctors were negligent.

Link appeals the trial court's orders granting summary judgment to Spencer and Northwest Pediatric Center and to Dr. Pickens and MultiCare's nursing team.[12]

---

[11] It is not clear from our record what became of the claim against Dr. Cobabe. This doctor is not addressed in Link's appeal and did not proceed to trial.

[12] Link's amended notice of appeal also designated both the judgment on the jury verdict and the judgment summary, but she only assigned error to the trial court's summary judgment decisions. In addition, NorthWest Congenital Heart Care and Dr. Park voluntarily withdrew their cross appeal of various trial court rulings during the pendency of this appeal.

DISCUSSION

I. STANDARD OF REVIEW

We review a summary judgment order de novo, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 287, 481 P.3d 1084 (2021). Summary judgment is appropriate when the pleadings, affidavits, depositions, and admissions on file demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "An issue of material fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 86, 419 P.3d 819 (2018). The purpose of summary judgment is to avoid a useless trial. *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979).

II. SUMMARY JUDGMENT ORDERS

A. LEGAL PRINCIPLES

*1. Medical Malpractice Claims*

"Tort actions based on injuries resulting from health care are generally governed by statute." *Grove v. PeaceHealth St. Joseph Hosp.*, 182 Wn.2d 136, 143, 341 P.3d 261 (2014); *see also* RCW 7.70.010. To prevail on a medical malpractice claim, a plaintiff must prove the following:

> (a) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances; [and]
>
> (b) Such failure was a proximate cause of the injury complained of.

RCW 7.70.040(1).[13] In general, expert testimony is required to establish both the applicable standard of care and proximate causation. *Grove*, 182 Wn.2d at 144. The expert's testimony must specifically establish how the defendant breached the standard of care and must link their conclusions to a factual basis. *Reyes*, 191 Wn.2d at 86-87. "Affidavits containing conclusory statements without adequate factual support are insufficient to defeat a motion for summary judgment." *Guile v. Ballard Cmty. Hosp.*, 70 Wn. App. 18, 25, 851 P.2d 689 (1993).

"A proximate cause of an injury is a cause which, in a direct sequence that is unbroken by any new independent cause, produces the injury complained of and without which such injury would not have happened." *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 448, 177 P.3d 1152 (2008). Proximate cause has two elements that must be satisfied: (1) cause in fact, and (2) legal causation. *Id.*

Cause in fact requires a plaintiff to "show that he or she would not have been injured but for the health care provider's failure to use reasonable care." *Id.* This is typically a jury question, but on review of a summary judgment order, "we review the record to determine whether the plaintiff has offered sufficient admissible evidence, which if proved, would support sufficient allegations of material fact to warrant sending the case to a jury." *Lynn v. Lab. Ready, Inc.*, 136 Wn. App. 295, 307-08, 151 P.3d 201 (2006). Again, a genuine issue of material fact is one that is supported by sufficient evidence for a reasonable jury to find in favor of the nonmoving party. *Reyes*, 191 Wn.2d at 86.

---

[13] RCW 7.70.040 was amended in 2021. Laws of 2021, ch. 241, § 2. Because this amendment does not impact out analysis, we cite to the current version of the statute.

Legal causation, on the other hand, focuses on " 'whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability,' " and " 'will depend upon mixed considerations of logic, common sense, justice, policy, and precedent.' " *Minahan v. W. Wash. Fair Ass'n*, 117 Wn. App. 881, 888, 73 P.3d 1019 (2003) (internal quotation marks omitted) (quoting *Schooley Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 228 (1974)). Legal causation is a question of law to be decided by the court. *Id.*

### 2. *Collateral Estoppel*

Collateral estoppel "bars relitigation of an issue in a subsequent proceeding involving the same parties." *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 306, 96 P.3d 957 (2004). The doctrine serves to promote judicial economy and finality in adjudications and prevent harassment of parties. *Id.* at 306-07. It only applies to preclude issues "that have actually been litigated," and "the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding." *Id.* at 307. The party seeking application of collateral estoppel must establish the following:

> (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding, (2) the earlier proceeding ended in a judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding, and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied.

*Id.*

### B. FACT OF AL HAVING BEEN SHAKEN

As an initial matter, several of AL's expert declarations claim that AL was not shaken by Davison on October 2, 2013. Davison, in his deposition in this case, also denied shaking AL. But

Davison pleaded guilty to assault of a child in the third degree against AL, occurring on October 2, 2013, and causing injuries to AL that substantially exceeded the level of bodily harm necessary to satisfy the elements of that offense. During his sentencing hearing, Davison admitted that he shook AL on October 2, 2013. And in his deposition, Davison admitted to giving a written statement to the police admitting that he shook AL.[14] Moreover, Dr. Michael Weinraub, Link's own expert, stated that AL was shaken, and opined that "[r]esuscitative shaking was one of the multifactorial causes that contributed to, along with hypoxia, aspiration and pneumonia, a cascade of events resulting in neurological devastation." CP at 4370. Dr. Weinraub further stated that if AL's treatments had "brought an end to the incidents of choking on her feedings," then "*resuscitative shaking would not have been invoked*, and the injuries and neurologic damage that occurred on 10/2/2013 would not have happened." *Id.* at 4383 (emphasis added).

Whether the shaking of AL was the sole proximate cause of the injuries she sustained on October 2, 2013 is a separate question. Likewise, whether the shaking by Davison would not have occurred had AL been treated surgically for her vascular ring is also a separate question. And Davison's *purpose* in shaking AL (whether to resuscitate or for some other reason) is irrelevant. That AL was shaken by Davison on October 2, 2013 is a settled fact, both because Davison admitted as such at sentencing and because Link's own evidence submitted to us avers it.

C. CLAIMS AGAINST THE PROVIDERS

The claims against all five providers in this case—Spencer, Dr. Pickens, and the three MultiCare nurses—fall into three categories: first, that the providers breached the standard of care

---

[14] One of Link's experts in this case, Dr. Satish Chundru, claims in his report that Davison gave a consistent story throughout both the criminal and civil proceedings in this case. This statement is plainly belied by other evidence submitted by Link.

by not advocating for or securing surgical treatment of AL's vascular ring prior to October 2, 2013; second, that the providers breached the standard of care by failing to properly educate Link and other caregivers on how to care for AL; and three, that the providers failed to make necessary referrals and follow-up appointments. All three claims are addressed below and all three claims fail, necessitating judgment as a matter of law in favor of the defendants.

*1. Failure to advocate for or procure surgical treatment of the vascular ring*

The majority of the experts who prepared declarations for Link in this case opine that the primary act or omission that breached the standard of care as to all providers in this case was the failure to either advocate for or obtain surgical correction of AL's vascular ring. Each of the medical experts put forth by Link opine that the failure of the medical providers to either urge or obtain surgery for AL was the proximate cause of her brain trauma on October 2, 2013.

The MultiCare providers (Dr. Pickens and the MultiCare nurses) argue that the issue of whether they breached the standard of care by not ensuring that AL received surgery is barred by collateral estoppel because three doctors (Dr. Reichert, and cardiologists Dr. Park and Dr. Kim) already proceeded to trial on the question of whether they breached the standard of care in not obtaining or performing surgery for AL prior to her assault on October 2, and the jury returned a verdict answering no to that question. Thus, the MultiCare providers argue, the issue Link now seeks to litigate against them is the *same issue* it already litigated against Drs. Reichert, Kim, and Park. Additionally, the party against whom collateral estoppel is asserted (Link) had a full and fair opportunity to litigate this issue in the 19-day jury trial against doctors Reichert, Kim, and Park. For that reason, application of collateral estoppel would not work an injustice against Link.

18

Link, in an effort to prevent the application of collateral estoppel, contends that the failure of the providers to seek surgical intervention for AL is not the same issue as the one litigated in the earlier jury trial because, whereas the alleged breach of the standard of care attributed to the doctors who proceeded to trial occurred while AL was hospitalized at Mary Bridge, the alleged breach attributed to Dr. Pickens and the Mary Bridge nurses occurred *after AL was discharged* from Mary Bridge. This distinction is wholly unavailing. There can be no question that, where the doctors in charge of AL's hospital and cardiac care were found to be not negligent in failing to obtain surgery for her, the MultiCare nurses and Dr. Pickens, a gastroenterologist whose role in the case was limited, cannot be deemed negligent for the same failing.

The surgery issue has been fully litigated in a proceeding involving Link, and a judgment on the merits was entered finding no negligence for the failure to perform surgery. We have reviewed the entirety of Link's closing argument and rebuttal at trial, and Link's theory of the case was that AL's vascular ring needed surgical repair and that she did not get it. Her attorney interchangeably uses the terms repair and fix, but it is clear to us, especially considering the expert declarations Link submitted in response to the motions for summary judgment, that the only repair or fix for AL's condition would be surgery. For example, no one has suggested that there would be any other means to treat the vascular ring such as medication, acupuncture, or physical therapy. The closing arguments considered as a whole, coupled with the jury instruction describing the parties' arguments, make it clear that the distinct act or omission alleged to have breached the standard of care was the failure to procure surgery.

The application of collateral estoppel will not work an injustice against Link. This issue, therefore, is collaterally estopped. A reasonable jury could not find Dr. Pickens or the MultiCare

nurses negligent in not advocating for a surgery that the cardiologists themselves were not negligent in declining to perform prior to October 2, 2013.

Although Spencer does not argue collateral estoppel, the doctrine applies with equal force to any claim that she breached the standard of care in failing to advocate for or obtain corrective surgery for AL's vascular ring prior to her injuries on October 2, 2013. We may affirm on any ground supported by the record, and it would be illogical to apply this doctrine to only the MultiCare providers where the issue is the same.[15] *See LK Operating, LLC v. Collection Grp.*, LLC, 181 Wn.2d 48, 73, 331 P.3d 1147 (2014).

### 2. Remaining claims

#### i. Dr. Pickens

Regarding Dr. Pickens, Link vaguely claims that he breached the standard of care by failing "to coordinate proper follow up care after discharge as AL's vascular ring grew 'tighter and tighter' and symptoms persisted." Br. of Appellant at 40 (quoting 5 Verbatim Report of Proceedings (Sept.

---

[15] Even if this issue was not precluded, we note that it is entirely speculative, even taking the evidence in the light most favorable to Link, that surgical intervention would have prevented AL from ever again choking on milk. Both Link and Davison testified that they regularly propped a bottle into AL's mouth, and Davison did not dispute that he propped a bottle in AL's mouth when he fed her the night of October 2, 2013. AL's providers had assisted Link with feedings, and she had been repeatedly instructed on the proper way to hold her infant while feeding her, including specific instructions to hold AL upright during feedings. As Dr. Park explained in his declaration, the cause of AL's choking could just as plausibly been due to Davison propping a bottle into her mouth as AL's vascular ring. (It should be noted that AL was too young to hold or remove the bottle herself, and as of her appointment with Sarah Spencer on September 9, 2013, AL's head was still wobbly and she could not hold it fully upright.) Additionally, it is speculative to assume that Davison would not have "invoked" shaking of this infant while alone with her. CP at 4383. Link, by her own admission, never brought Davison to one of AL's appointments and, therefore, he would not have heard the repeated advisements she received to never shake a baby. Link did not recall receiving such advisements because she knew "that's something you just don't do," which suggests she felt the dangers of shaking a baby were universally known. *Id.* at 1269.

29, 2021) at 852). To the contrary, Dr. Pickens treated AL on one occasion, scheduled a swallow study for AL, and referred her back to Spencer for primary care. Link fails to show that Dr. Pickens did not properly coordinate follow-up care to treat AL. And even so, Link fails to explain how Dr. Pickens' alleged failure to coordinate proper follow-up care after AL's discharge from Mary Bridge—apart from any claim related to referring her for surgical repair of the vascular ring—was a proximate cause of the injuries AL sustained on October 2, 2013. As a result, the connection between AL's injuries and Dr. Pickens' treatment is " 'too remote or insubstantial to impose liability.' " *Minahan*, 117 Wn. App. at 888 (quoting *Schooley*, 134 Wn.2d at 478).

### ii. Mary Bridge MultiCare nurses

As with Dr. Pickens, the remaining claims against the nurses are either too vague to determine the act or omission alleged or involve acts that either the nurses had no duty to perform or were in fact performed by the nurses. The claims against the MultiCare nurses are set forth in Link's brief as follows:

> "1. Failure to recognize that [A.L.] was not being followed and undergoing further workup of her cardiac condition during hospital admission at one month of age.
>
> 2. Failure to follow and carry out care management orders by discharging physician.
>
> 3. Failure to provide a thorough and complete workup for failure to thrive.
>
> 4. Failure to provide a medical workup and ongoing care for an ALTE.
>
> 5. Failure to recognize caregiver's knowledge deficits concerning feeding and respiratory assessment for continuing care of a high risk infant with a congenital heart defect.
>
> 6. Failure to discuss with medical provider the rationale for discharge in an unstable patient without advocating for the patient by affirming the provider is aware of patient data and caregiver concerns indicating unstable condition prior to discharge.

7. Failure to provide education and training for [A.L.'s] caregivers about precautions, prevention and resuscitation skills as required by the standard of care for an infant with prior ALTEs.

8. Failure to provide [A.L.'s] caregivers with discharge instructions for failure to thrive and ALTE and what to do in case of another ALTE or poor feeding episodes."

Br. of Appellant at 39-40 (alteration in original) (quoting CP at 4247-48).

Link does not say how the care provided by the nurses did not constitute a "complete workup" for failure to thrive or a " 'medical workup' " for an ALTE, nor does she explain what " 'ongoing care' " the MultiCare nurses failed to provide. *Id.* at 39 (quoting CP at 4247-48). The MultiCare nurses made follow-up appointments for Link with cardiology and gastroenterology, and provided Link with the means of obtaining transportation to these appointments. They also provided Link with a WIC form allowing her to obtain an increase in formula so that she could feed AL 18 ounces per day, and they instructed Link on meeting AL's caloric intake by feeding AL with greater frequency than Link had previously been feeding her and using higher calorie formula.

Following AL's July 2013 hospitalization, Link was provided with detailed discharge instructions, which were reviewed with her by Nurse Johnson, and was told to follow up with both her primary care provider as well as the specialists with whom she had appointments set. Link fails to provide specifics about her allegation that the MultiCare nurses failed to " 'follow and carry out care management orders by [the] discharging physician.' " *Id.* (quoting CP at 4247). And insofar as Link suggests the MultiCare nurses should have demanded from AL's doctors the rationale for her discharge and that they failed to prevent her discharge by disagreeing and arguing with her doctors (*see generally* number six), Link cites no authority suggesting nurses have such a duty. When a party cites no authority in support of a proposition, we may assume counsel has found

22

none. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). Moreover, it would make little sense to impose such a duty upon nurses, as MultiCare notes in its brief.

Regarding Link's claim that the MultiCare nurses failed to train all of AL's caregivers on precautions, preventions, and infant resuscitation, Link again cites no authority for the proposition that nurses have a duty to train all caregivers on these matters. It is noteworthy that nowhere in the medical records is there any mention by Link of the presence of Davison in AL's life or that he was a partial caregiver for her. Link does not indicate who, beyond herself, these caregivers are to whom the Mary Bridge nurses owed a duty. And as it relates to Link, she was, again, repeatedly advised in the months leading up to AL's assault about the proper way to feed AL and to never, ever shake AL.

Even if Link's claims against the nurses were not either too vague or plainly belied by the record, Link's arguments do little to address how these claimed acts or omissions were a proximate cause of the serious brain injures AL suffered on October 2, 2013. Even if, for example, the nurses had trained Link in infant resuscitation, that would have done little good because Link was not even home when AL began choking while in Davison's care. Although Link's declarations at summary judgment attempted to find other causes of AL's injuries to point the finger away from Davison's assault, the inconsistent statements by her experts still could not establish causation by these providers for AL's injuries, as the connection between AL's injuries and the nurses' care for AL is " 'too remote or insubstantial to impose liability.' " *Minahan*, 117 Wn. App. at 888 (quoting *Schooley*, 134 Wn.2d at 478).

Accordingly, Link has not established that the trial court erred by dismissing these defendants on summary judgment.

### iii. Sarah Spencer, ARNP

Link argues that the trial court erred by dismissing Spencer on summary judgment because testimony provided by her experts established that Spencer's actions fell below the standard of care. Link claims that her expert declarations established the following breaches of the standard of care by Spencer, in addition to other alleged breaches: failing to take the lead role in coordinating AL's care and communicate with specialists regarding AL's ongoing symptoms, failing to refer AL to other specialists, like a pulmonary expert, failing to advocate for surgical intervention, and failing to adequately educate Link as to the risks associated with AL's condition and plan of care.

To the extent that Spencer's alleged acts or omissions stem from a failure to obtain surgery, that claim, again, is estopped for the reasons described above. Even if Link's claims against Spencer regarding a failure to obtain surgery were not estopped, Link cannot show proximate cause. There is no evidence that AL would have obtained surgery any sooner if Spencer had badgered or cajoled the doctors and/or surgeons to perform the surgery. This is evidenced by the recommendation at the surgical conference at the end of October 2013, occurring after the October 2 incident with Davison, where the attendees decided against surgery for AL due to the potential risks of operating on her while she was so young. This claim necessarily includes any allegations that Spencer failed to refer AL to proper specialists because, as described above, the only fix for AL's condition argued by Link is surgical intervention.

To the extent that Link's claims focus on Spencer's alleged failure to properly instruct Link how to care for and feed AL, this claim is belied by undisputed facts in the record. The medical records show that, on more than one occasion, Spencer observed and assisted with feedings and discussed safety practices, well-infant care, cerebral stimulation and activities, and nutritional

No. 56524-2-II

needs with Link. Spencer also discussed concerns about crying, including PURPLE crying, and parental frustration and repeatedly instructed Link that caregivers should never, ever shake a baby. Link has not established that any failures by Spencer proximately caused the traumatic brain injuries AL suffered while in the care of Davison. The connection between AL's injuries and Spencer's care for AL is " 'too remote or insubstantial to impose liability.' " *Minahan*, 117 Wn. App. at 888 (quoting *Schooley*, 134 Wn.2d at 478).

Accordingly, Link has not established that the trial court erred by dismissing Spencer on summary judgment.

CONCLUSION

We hold that Link's arguments are without merit and affirm the trial court's orders granting summary judgment to the defendants.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, A.C.J.

We concur:

LEE, J.

PRICE, J.

25